# JAMES *v.* STATE
[No. 137, October Term, 1948.]

*Decided April 27, 1949.*

The cause was argued before MARBURY, C. J., and DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*William H. Murphy,* with whom was *Charles H. Houston* on the brief, for appellant.

*Harrison L. Winter, Assistant Attorney General* with whom were *Hall Hammond, Attorney General, J. Bernard Wells, State's Attorney for Baltimore City, Anselm Sodaro* and *Alan H. Murrell, Assistant State's Attorney for Baltimore City,* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal *in forma pauperis* from a sentence to death on a verdict, by the court without a jury, of guilty of murder in the first degree.

On July 6, 1948, a few minutes after noon, Marsha Brill, eleven years old, was stabbed with a large knife by a colored man who came up Glen Avenue or out of the bushes on the side of Glen Avenue. She died of the wound at Union Memorial Hospital early the same afternoon. There is no evidence of an attempt to rape or that before the killer appeared on Glen Avenue appellant had even seen her.

Before she was stabbed she and two young friends, Barbara and Allan Sapperstein, eleven and eight years old respectively, had been riding bicycles down Glen

Avenue. The boy had turned back up the hill and the girls had stopped. When the man appeared he pointed a large knife at Marsha. She ran down the hill and Barbara up. The man followed and overtook Marsha, who was found lying on the ground, stabbed and crying, beside the road. A woman who lived in the neighborhood testified that about noon she saw appellant pass her house with a large knife in his hand.

Appellant was 31 years old. He had gone to several schools, never got beyond the fourth or fifth grade, and left school when he was about thirteen or fourteen. Four psychiatrists, Dr. Lerner, Dr. Guttmacher, medical officer of the Supreme Bench, Dr. Cushing and Dr. Spear, and one psychologist, Mr. Schoenrich, an assistant in Dr. Guttmacher's office, examined him and testified. Drs. Cushing and Spear were called by the State, the others by the defense. Drs. Guttmacher, Cushing and Spear testify that appellant was a responsible agent, that is, he knew the difference between right and wrong and the nature and consequences of his acts as applied to himself. There is no testimony to the contrary.

Dr. Guttmacher testifies that appellant "has rather meager intellectual endowments, but is not seriously intellectually deficient. He can probably best be classified in the borderline group." Mr. Schoenrich agrees with Dr. Guttmacher that "although he is somewhat deficient intellectually, his defect is not a very serious one." Dr. Guttmacher considers him "a very severely mentally disordered individual," but "does not feel that he is suffering from a definite psychosis," that is, "from definite insanity"; he believes that "he is an extremely abnormal individual from the psychiatric point of view." Dr. Guttmacher "would need a great deal of confirmation to be sure of any story he gave" him. He "appears to wish to give the impression that he is mentally disordered. His efforts in this direction are inconsistent, and quite unintelligent." Dr. Guttmacher believes that, when he was examined, he was malingering "in a very stupid psychopathic way." In Mr. Schoenrich's opinion, "he

has a severe mental disorder," which "expresses itself in a relative disregard for reality, tendency to indulge in fantastic thinking which has little connection with external realities," and there are also "indications of paranoid trends * * *, tendency to develop delusional systems," and "schizophrenia is indicated"; he would say "it is exceedingly hazardous" to rely upon the accuracy of any responses which he might give to questions; he thinks "he is given to developing ideas which suit his fancy, and which have little relation to the real situation." Dr. Lerner's opinion is that appellant "is a mental defective belonging to the class of low-grade morons, and may be classified as a defective delinquent." A certain test represented that he "is a mental defective classified as a low-grade moron". His mental age was "somewhere just under ten"; he very definitely had fantastic ideas. A test revealed "some schizoid characteristics and evidence of hostility towards the immature female".

Dr. Cushing says in his report that appellant "is feeble-minded with an estimated I. Q. 60 to 65" and that during examination he quite definitely was malingering; that he was not, in his opinion, "a psychopath, but would fall into the group of defective delinquents, that is, mentally defective but not totally irresponsible as to his relations to society and to individuals in any intimate contact with him". Dr. Spear testifies that tests showed "he had the intelligence of the average individual of about eleven years. He was below normal. Taking into consideration his contacts, his opportunities, and so forth, I should say that he had the average intelligence for a man of his age and opportunities. He wasn't a smart person, he wasn't an absolutely dumb person, but he was a shrewd individual. The examination showed him to be a pathological liar".

On July 6, 1948, the day of the killing, about 10:45 P. M. appellant was arrested at his home by two policemen, taken to the Northern Police Station, "placed on the books" at 11:05, "charged with investigation," searched and put in a cell. About 12:15 A. M. (on July 7th) he

was brought out of the cell, taken into Captain Lusby's office and questioned until about 1:30 A. M. He was then put back in his cell and remained there till about 2:55 P. M. He slept practically the whole night on the bench in the cell, part of the time in a sitting position, the rest of the time lying on his back. While he was at the Northern Police Station, he was given meals. At 2:55 P. M. he was given "coveralls," which the police had taken out of his house that morning, to put on. They were put on, and he was taken to Police headquarters and about 3:30 P. M. was put in a "line-up." Then he was taken into the cell block at the Bertillon Bureau for a few minutes, then into the office of Captain of Detectives Kriss, where Captain Kriss and Lieutenant Bryan had a short talk with him. Then, about 4:55 P. M., he was taken by Detective Lieutenants German and Hettchen and Sergeant Mahrer to a wooded section at Wabash and Sequoia Avenues. About 7:25 P. M. he was brought back to the Central Police Station, turned over to the turnkey and put in a cell. He remained in the cell until about 8:20 A. M. (on July 8th), when he was taken upstairs to Captain Kriss's office at Detective Headquarters. About 9 o'clock Captain Kriss turned him over to Lieutenant Bryan, who took him around the Bertillon Bureau till after roll call and about 9:15 back to Captain Kriss's office, where they talked to him till about 9:45. Lieutenant Bryan then took him back into his own office and took a statement from him, not about this case, and about 10:20 took him back to Captain Kriss's office, where they questioned him till about noon. He was then sent back to the Homicide Bureau, where he got his dinner. He was told to order what he wanted and ordered pork chops. About 1.55 P. M. Captain Kriss brought him back to his office where he remained with Captain Kriss, Inspector Itzel and Lieutenant Bryan until about 2:10 P. M.

He then was taken by Inspector Itzel and other policemen on an automobile trip through northern sections of the city and about six o'clock back to the Northern Police

Station, where he was charged with murder and then put in a cell. Captain Lusby and another policeman went on the trip in another car. On the trip, at the scene of the crime, appellant confessed his guilt. After giving false leads, first to a trash dump for a "sharp pointed stick," and then to his home for a non-existent chisel, with which he "might have done it," he admitted "it was a knife" and showed where he had buried the knife, and had marked the place with a stone and some twigs, in the woods on Whitney Avenue near Key Avenue. The knife was then and there dug up and at the trial was, with the stone and twigs, offered in evidence. About eight o'clock the same evening appellant was taken from his cell at the Northern Police Station to the "Board Room" at the Central Police Station, where questions to him by Inspector Itzel and his answers were taken and written by a stenographer, read and signed by appellant, who also initialed each page, and witnessed by Inspector Itzel, Captain Lusby and two other policemen. The questioning began at 8:03 P. M. and ended at 8:43 P. M. The statement was transcribed by 9:43 P. M. and signed at 10 P. M. At 1 A. M. (July 9th) appellant was put in a cell at the Central Police Station for the night.

Appellant's mother and two of his sisters testify that on July 7th, about the middle of the day, at their house the mother asked Officer Lowman whether she could see appellant and the officer told her, no, she couldn't see him, nobody could see him but "the lawyer." The same day, as a result of that statement, she saw and employed a lawyer (who participated in the trial below and argued the case in this court), but did not tell him that statement till Friday (July 9th).

Appellant's signed statement was substantially the same as his oral statements in the afternoon of the same day. It was a complete confession of guilt of the crime charged. It was mutely corroborated by the knife, the stone and the twigs. Upwards of twenty-five witnesses, apparently practically everyone who had any contact with him from the time of his arrest till he signed the

statement, including two Assistant State's Attorneys (who tried the case below), the Chief Inspector of Police, an inspector, captains, lieutenants, turnkeys, chauffeurs, detectives, other policemen and the stenographer, testify without contradiction that neither they nor anyone in their presence used any violence or made any threats or promises or offers of indemnity. The signed statement, testimony as to the oral statements, and the knife, the stone and the twigs were admitted in evidence over objection.

At the argument in this court appellant admitted—indeed insisted—that there is no evidence of physical coercion, but earnestly contended that the facts amount to "psychological torture" and make the confession inadmissible. He relies upon *Upshaw v. United States,* 335 U. S. 410, 69 S. Ct. 170, and other recent Supreme Court cases.

In *Ibrahim v. Rex,* [1914] A. C. 599, 609, an appeal from Hong Kong to the Judicial Committee of the Privy Council, it was said, by Lord Sumner, "It has long been established as a positive rule of English criminal law, that no statement by an accused is admissible in evidence against him unless it is shown by the prosecution to have been a voluntary statement, in the sense that it has not been obtained from him either by fear of prejudice or hope of advantage exercised or held out by a person in authority." [Quoted in *Rex v. Voisin* (1918) 1 K. B. 531, 537-538, and in *Cox v. State,* 192 Md. 525, 533, 64 A. 2d 732-735.] In 1914, when this statement was made, and in 1918, when it was repeated, it was an adequate statement of the *law* in England and in most American jurisdictions, including the Supreme Court and Maryland. In *practice,* the admissibility of confessions in evidence in England had already become more restricted, and has since become still more restricted, in the customary exercise of discretion by trial judges and in rulings of the Court of Criminal Appeal. *Cf. Rex v. Grayson,* 16 Cr. App. R. 7, cited in *Cox v. State, supra.* The English practice in this respect is reflected, but has not been followed, in recent decisions of the Supreme Court. "In

1912 the Judges of the King's Bench, at the request of the Home Secretary, issued rules for the guidance of police officers. See *Rex v. Voisin*, L. R. [1918] 1 K. B. 531, 539. These rules were amended in 1918, and in 1930 a circular was issued by the Home Office, with the approval of the Judges, in order to clear up difficulties in their construction. 6 Police Journal (1933) 352-56, containing the texts of the Judge's Rules and the Circular. See Report of the Royal Commission on Police Powers and Procedure (1929) Cmd. 3297. Although the Rules do not have the force of law, *Rex v. Voisin, supra,* the English courts insist that they be strictly observed before admitting statements made by accused persons while in the custody of the police. See *1 Taylor on Evidence* (12th ed. 1931), pp. 556-562; *'Questioning an Accused Person',* 92 *Justice of the Peace and Local Government Review* 743, 758 (1928); *Keedy, Preliminary Examination of Accused Persons in England,* 73 *Proceedings of American Philosophical Society* 103 (1934). For a dramatic illustration of the English attitude towards interrogation of arrested persons by the police, see *Inquiry in Regard to the Interrogation by the Police of Miss Savidge* (1928), Cmd. 3147." *McNabb v. United States,* 318 U. S. 332, 345-346, 63 S. Ct. 608, 615, 87 L. Ed. 819. In excluding such evidence, Lord Sumner said, the judges were concerned rather with the "duties of policemen" than with "rules of law." *Ibrahim v. Rex, supra,* 611. In the *Report of the Royal Commission on Police Powers and Procedure* (1929), which followed the *Inquiry in Regard to the Interrogation by the Police of Miss Savidge* (1928), it was said: "A rigid instruction should be given to the Police that no questioning of a prisoner, or a 'person in custody', about any crime or offense with which he is, or may be, charged, should be permitted." *Wigmore on Evidence,* 3d Ed., § 847, p. 295; *cf. United States v. Mitchell,* 322 U. S. 65, 68-69, 64 S. Ct. 896, 88 L. Ed. 1140; *Malinski v. New York,* 324 U. S. 401, 418-419, 65 S. Ct. 781, 89 L. Ed. 1029.

We need not inquire or speculate about the legal source of the present English practice of altogether excluding confessions obtained by the police from persons under arrest. Whether this practice is due to (*a*) partial survival of the judge's role as "counsel for the prisoner" when the prisoner was not allowed other counsel or (*b*) absence of binding authority, in the absence of criminal appeals before 1907 and the practically total absence of House of Lords decisions since 1907, or (*c*) freedom from the rigidity of a written constitution in respect of separation of powers, or (*d*) some other cause, in Maryland no such discretionary power of exclusion is possessed by trial judges or by this court on appeal. If, because of danger of abuse of power by the police, and doubt and distrust of police testimony (*cf. Queen v. Thompson,* [1893] 2 Q. B. 13, 18), and the prisoner's difficulty in rebutting such testimony, the English practice of excluding such confessions—or the federal practice regarding confessions—is to be adopted in Maryland, this must be done by the legislature (or perhaps the rule-making power), not by the courts in the trial of cases. In *Toomer v. State,* 112 Md. 285, 292, 76 A. 118, 122, this court said of the confession there in question, "Without meaning to approve of the method by which the confession of the appellant was obtained, a confession made under such circumstances [which did not include threats or promises or prevent a finding that the confession was voluntary] was clearly admissible." See also *McCleary v. State,* 122 Md. 394, 397, 400, 405, 89 A. 1100. In the instant case, as in the many previous cases in this court, we neither approve nor disapprove the methods by which the confession was obtained, except to the extent that the methods are relevant to the legal question of admissibility of the confession.

We have already pointed out that *Upshaw v. United States, supra,* and *McNabb v. United States, supra,* are decisions, not on questions of due process under the Fifth or Fourteenth Amendment, but on questions of federal procedure and therefore are not binding upon this court,

and have held that Maryland law of evidence is at variance with federal procedure on those questions. *Cox v. State, supra.* In *Upshaw v. United States, supra,* 335 U. S. 413, 69 S. Ct. 172, the court interpreted *United States v. Mitchell, supra,* as reaffirming "the *McNabb* rule that a confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate, whether or not the 'confession is the result of torture, physical or psychological * * *.'" In *United States v. Mitchell, supra,* 322 U. S. 68, 64 S. Ct. 897, 88 L. Ed. 1140, the court said, "The *McNabb* decision was an exercise of our duty to formulate policy appropriate for criminal trials in the federal courts." "The principles governing the admissibility of evidence in federal criminal trials have not been restricted, therefore, to those derived solely from the Constitution. In the exercise of its supervisory authority over the administration of criminal justice in the federal courts, * * * this Court has, from the very beginning of its history, formulated rules of evdence to be applied in federal criminal prosecutions. * * * And in formulating such rules of evidence for federal criminal trials the Court has been guided by considerations of justice not limited to the strict canons of evidentiary relevance." *McNabb v. United States, supra,* 318 U. S. 341, 63 S. Ct. 613, 87 L. Ed. 819. In the *Upshaw* case, *supra,* 335 U. S. 416, 69 S. Ct. 173, the four dissenting justices did not object to the court's power to extend "the scope of non-admissibility of confessions in the federal courts," but only to the advisability of so doing. This court has no power in deciding a particular case to change the rules of evidence. In Maryland the law of evidence, like the substantive common law, has been developed by judicial decisions applying old principles to new facts, but conscious changes in the law of evidence have been made by the legislature.

The facts of the instant case cannot be distinguished from cases sustaining the admissibility of voluntary confessions, (*i. e.,* not obtained by fear of prejudice or hope

of advantage), by calling them "psychological torture". It is difficult to distinguish sharply, if at all, between physical and psychological torture or pressure. Practically all torture or pressure to obtain a confession operates psychologically. Fear and hope are psychological forces. Even the most brutal physical torture (*cf. Brown v. Mississippi,* 297 U. S. 278, 56 S. Ct. 461, 80 L. Ed. 682) usually produces a confession, not during the actual torture but afterwards through fear of repetition. As late as the reigns of the Tudors and the first Stuarts, torture was so used to obtain confessions or other testimony in court. *A. Lawrence Lowell, The Judicial Use of Torture,* 11 Harvard Law Review 200, 290; *Wigmore, supra,* § 818, p. 235. On the other hand, prolonged incessant questioning, sometimes called "psychological torture," often has irresistible physical effects in preventing sleep and causing other nervous disturbance. *Cf. Ziang Sun Wan v. United States,* 266 U. S. 1, 14-16, 45 S. Ct. 1, 69 L. Ed. 131. Moreover, the inner psychological pressure, of conscience, "penitence and remorse" (*Queen v. Thompson, supra,* 18), to tell the truth does not constitute coercion, in the legal sense, which renders a confession "involuntary." Inner moral or religious pressure to tell the truth (at least if unaided by external stimuli) ordinarily gives weight to a confession, *Cf. Wigmore, supra,* § 840.

In recent years the Supreme Court has several times mentioned "torture, physical or mental" (*Palko v. Connecticut,* 302 U. S. 319, 326, 58 S. Ct. 149, 152, 82 L. Ed. 288), "physical and mental torture", (*Chambers v. Florida,* 309 U. S. 227, 237, 60 S. Ct. 472, 477, 84 L. Ed. 716), "psychological pressure" and "torture, physical or psychological", *United States v. Mitchell, supra,* 322 U. S. 67, 68, 64 S. Ct. 897, 88 L. Ed. 1140; *Upshaw v. United States, supra,* 335 U. S. 413, 429, 430, 435, 69 S. Ct. 170) or "psychological coercion" (*Upshaw v. United States, supra,* 335 U. S. 412, 69 S. Ct. 179) without defining or distinguishing these expressions. In the *Upshaw* case the court rejected the lower court's interpretation of the

*McNabb* case as merely extending the meaning of "involuntary" confessions "to include psychological coercion as well as that brought about by physical brutality." 335 U. S. 412, 69 S. Ct. 171. "Psychological torture" is not a fact or a legal concept; it is only a figure of speech.

In *United States v. Mitchell, supra,* 322 U. S. 67-68, 64 S. Ct. 897, the court said: "We are dealing with the admissibility of evidence in criminal trials in the federal courts. Review by this Court of state convictions presents a very different situation, confined as it is within very narrow limits. Our sole authority is to ascertain whether that which a state court permitted violated the basic safeguards of the Fourteenth Amendment. Therefore, in cases coming from the state courts in matters of this sort, we are concerned solely with determining whether a confession is the result of torture, physical or psychological, and not the offspring of reasoned choice. * * * But under the duty of formulating rules of evidence for federal prosecutions, we are not confined to the constitutional question of ascertaining when a confession comes of a free choice and when it is extorted by force, however subtly applied. * * * The *McNabb* decision was an exercise of our duty to formulate policy appropriate for criminal trials in the federal courts." In short, in a state court under the Fourteenth Amendment a confession is inadmissible if it is "the result of torture, physical or psychological," but in a federal court under the *McNabb* decision it may be inadmissible even in the absence of any such torture.

In the instant case the signed confession on its face purports to be voluntary and to have been neither induced nor preceded by any violence, threats or promises. The uncontradicted testimony of a host of witnesses affirmatively supports the confession in this respect. There is no internal or external evidence to the contrary. The signed confession was obtained within forty-eight hours after arrest. During this period appellant was several times questioned by the police, but not at exhausting lengths, and was not deprived of food, rest or sleep or

subjected to personal indignities (such as being required to take off his clothes, *Malinski v. New York*, 324 U. S. 401, 65 S. Ct. 781, 89 L. Ed. 1029). The night he was arrested and the next night he was left undisturbed for about thirteen hours each night—1:30 A. M. to 2:55 P. M. and 7:25 P. M. to 8:20 A. M. His longest contact with the police were from 2:55 P. M. to 7:25 P. M. on the afternoon of the 7th, including a line-up at 3:30, some questioning at Police Headquarters and an automobile trip of about two hours and a half; questioning, not continuous, the next morning between 8:20 A. M. and noon; and an automobile trip of almost four hours that afternoon, during which trip he confessed and explained the crime and dug up the weapon. Since these facts and this evidence, plus the fact that appellant was not arraigned or charged with the crime until over forty-three hours after arrest, and did not see family, friends or counsel before the confession was signed, do not make the confession involuntary or inadmissible (*cf. Cox v. State, supra*), appellant urges that the additional fact of his "intellectual deficiency," "mental disorder" and "psychiatric abnormality" make the confession inadmissible. It has been held (four justices dissenting) that a boy of 15, "a mere child," "cannot be judged by the more exacting standards of maturity," and that when such a boy was arrested about midnight on a charge of murder and questioned by relays of police from shortly after midnight for about five hours, without benefit of counsel or any friend to advise him, and when confronted with alleged confessions of accomplices around 5 A. M., confessed and signed a confession typed by the police, admission of this confession in evidence was a violation of the due process clause of the Fourteenth Amendment. *Haley v. Ohio*, 332 U. S. 596, 599, 68 S. Ct. 302, 303. Perhaps on adequate facts some similar result might be reached with respect to an incompetent adult.

We find in the psychiatric and psychological testimony no basis for reversing the trial judge's finding of fact that this confession was voluntary and admissible. Psy-

chiatrists and psychologist do not say appellant was, in either the legal or the medical sense, insane; they say he was not. In the face of the experts' own conclusions, we cannot by piecing together some of their terminology erect a medico-legal pseudo-science of our own to exclude this confession. If criminals were required to pass a character and fitness test to qualify to confess guilt, there would be few confessions admitted in evidence or pleas of guilty accepted. This may or may not be a good reason for not changing the law, but it illustrates that appellant's contention has no basis in existing law.

At the oral argument the only question discussed by appellant's counsel was the admissibility of the confession and the weapon. The greater part of his brief was devoted to a contention that conviction of murder in the first degree is not justified because of absence of premeditation. The trial judge in his opinion, when he gave the verdict, said: "There is no doubt that the court is dealing not only with a dangerous individual, but with an individual who is a defective delinquent. There is also no doubt from all of the four corners of the medical testimony, and the act itself, that the motive in this case is not difficult to find. The motive in this case, mysterious as it might be to normal people, cruel and heartless as it might seem to people whose functions are normal, to him was just as clear as daylight. We don't have in this State as a part of our law of testing legal insanity or legal sanity, any portion of that realm of psychiatry which deals with compulsions. The court is using this expression loosely, and not in a medical sense at all. But this was a compulsive act. * * * The court must make its decision, as was pointed out, from only the evidence in the case. But the statement by Dr. Lerner, who is the doctor produced on behalf of the defendant, helps make clear what would otherwise be a perfectly senseless, nonunderstandable, brutal killing. 'The Rohrschach test, however, reveals some schizoid characteristics and evidence of hostility towards the immature female, * * *.' The court believes this was a deliberate and premeditated

killing, as deliberate and premeditated as one of his capacity and with his compulsions could commit." Appellant says a compulsive killing of a total stranger, without any motive or purpose except killing, is "a perfectly senseless, nonunderstandable, brutal killing," and cannot involve premeditation. At least once during this term, *Wood v. State,* 191 Md. 658, 62 A. 2d 576, we have applied to the question of premeditation the established rule that under existing procedure we cannot review the weight or even the legal sufficiency of the evidence to show that the accused is guilty of the crime of which he was convicted. *Cf. Knowles v. State,* 192 Md. 664, 65 A. 2d 179.

*Judgment affirmed, without costs.*