## GLOVER *v.* STATE

[No. 165, October Term, 1952.]

*Decided June 12, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Milton B. Allen,* with whom were *W. Emerson Brown, Robert B. Watts,* and *Brown, Allen & Watts* on the brief, for the appellant.

*Kenneth C. Proctor, Assistant Attorney General,* with whom were *Edward D. E. Rollins, Attorney General,* and *Carlyle J. Lancaster, State's Attorney for Prince George's County,* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

Lott Glover, the appellant, was convicted of murder in the first degree and of robbery in the Circuit Court for Prince George's County and his appeal from the judgment and sentence which followed relies only on the one contention that the trial court erred in admitting his confession.

Very early in the morning of January 29, 1952, Glover, intending to go to Philadelphia, left Washington in his automobile, accompanied by two women, Gertrude Mackall and Helen L. Dyson. About four-thirty A.M. they

arrived at an all night filling station in Beltsville on the Washington-Baltimore Boulevard. Glover asked James Alfred Beacraft, the attendant, the way to Baltimore, and then drove down the road a short distance and stopped. He walked back to the filling station and shortly thereafter, returned to the car, carrying an automobile battery, two boxes of cigars and a hammer, which he placed in the car. About five-fifteen A.M. Beacraft appeared at the nearby house of the proprietor of the filling station in serious condition, having been beaten over the head with a blunt instrument. He explained that this occurred in the course of a robbery of the filling station. He was taken to a hospital in Laurel and then to the University Hospital in Baltimore, where he died about eight o'clock, as a result of the beating.

The State Police were notified by the owner of the filling station, and, outside of Laurel, Glover was stopped by a member of the Laurel Police force from whom he escaped into an adjoining woods. The two women attempted to make a similar escape but were seized and taken into custody as material witnesses.

Glover was next seen, according to the testimony, in a pool parlor in Washington, whence he had gone by bus after coming back to the highway. One Lucian Woolley played a number of games of pool with him there. Glover asked Woolley to go to his room to get him some clothes and barber tools. Woolley went to the room to be greeted there by the police. Glover had left the pool parlor when they returned. The police picked up information that he had left Washington on a Greyhound bus for Baltimore and in the early part of the evening of the day the crime was committed, two State Policemen took him from the bus and to the Hyattsville Police Station. He arrived there about eleven P.M. and was taken to the identification room of the Detective Bureau, where he remained a little over two hours. He was then identified in a lineup by Gertrude Mackall, and by George T. Johnson, the Laurel Policeman who had stopped him and from whom he had escaped.

All of this was either related or admitted by the appellant from the witness stand, or was not seriously questioned by him. He claimed in his testimony that although he had robbed the filling station by means of a gun, which he had pointed at Beacraft, he had not struck him or harmed him in any way, and that the killing had been done by two of his friends who were following him from Washington to Philadelphia in another car. They, he said, had come along as he was arguing with Beacraft, who struck him, and they told him to go ahead to Baltimore, where they would meet him after they had roughed up the attendant for what he had done.

Soon after two o'clock on the morning of January 30, about three hours after reaching the police station, Glover confessed to the robbery and the murder of Beacraft, saying that he had "knocked him out with the butt of heavy pinch pliers". In another place, he says that he "hit him up alongside the left ear . . . with a pair of a heavy duty pliers". The confession was taken down, question by question and answer by answer on a typewriter in the Detective's room of the station. It began some forty minutes after Glover was first questioned there by a number of police officers.

It is this confession which the appellant contends earnestly should not have been admitted, because it was not shown to meet the tests of admissibility which this Court has laid down. These tests were restated in *Linkins v. State*, 202 Md. 212, 222, 96 A. 2d 246, 251, decided this Term. We said there, quoting from *Smith v. State*, 189 Md. 596, at page 603, 56 A. 2d 818: "Before a confession can be admitted in evidence, the State must show, to the satisfaction of the court, that it was the free and voluntary act of an accused; that no force or coercion was exercised by the officers obtaining the confession, to cause the accused to confess; that no hope or promise was held out to an accused for the purpose of inducing him to confess."

Glover says that when he got to the Police Station at Hyattsville, they put him downstairs in a back cell and several police officers came in the cell, "started slapping me up with a short rubber hose", but that he told them nothing. He says that they took him upstairs to the Detective's room, that Woolley was invited to leave the room and then the Sergeant and the officers "give me the working over". Woolley then came back and Glover and Woolley got into an argument, and according to Glover, the officers said that they would "take care of him." He adds that then they were "giving me the third degree". Finally, he says that after they had written down the statement, they held his hand and signed it for him by moving his hand and arm. On cross-examination, he explained that by the third degree, he meant this: "I mean just like four or five or six men catch you and they have rubber hoses and they sap you up and knock you down on the floor and kick you and stomp on you with their feet."

The appellant argues that the State must show affirmatively that the confession was not influenced by any promise, threat or inducement of any kind, and that in the face of his testimony, that of the nine witnesses who were produced for the State, fails to add up to such an affirmative showing. In the argument here, the appellant contended in effect that none of the witnesses had been asked the leading and direct question: "Was the accused threatened, promised or induced?", but rather that the question asked was: "Did you see anything unusual or out of the ordinary?" Reading of the evidence shows that the appellant's contention is not sound and that the State did show, albeit in somewhat disconnected fashion, clearly and convincingly, that the confession was freely made.

The first two witnesses, Policemen Wiseman and Thompson, who took Glover from the Greyhound bus, testified that they had no conversation with him other than to ask him his name and where he was going, and to tell him that if he were not the man they wanted,

they had arranged for him to continue his transportation to Baltimore without additional charge. This they said was the entire conversation and no more is claimed by the appellant.

Of the remaining seven witnesses, one was Woolley, the Washington poolroom acquaintance. His testimony is that he was taken to the Hyattsville Station early in the morning of January 30 and told that Glover was in the room to the right. He identified Glover as the man with whom he had been playing pool and whom he knew as Willie Green. They stayed in the same room until the arrival of Gertrude Mackall, who was brought over to Hyattsville from the Waterloo Barracks. He estimates the time at about an hour and forty-five minutes. He left the room during this period only once, for some ten or fifteen minutes to go to the men's room and to drink a Coca-Cola. After Glover had been identified by Gertrude Mackall and the Laurel police officer, he was taken upstairs to the Detective's room and questioned in the presence of six police officers and the witness Woolley. All were there the entire time, from the beginning of the questioning, about one-thirty, until the confession had been typewritten and signed or initialled by those present, about three fifteen, except that Sergeant Bonaccorsy came in fifteen minutes after the questioning had begun.

Woolley says that when the confession was taken, Glover was sitting down at the desk, not handcuffed, but in fact, eating sandwiches and drinking coffee with the others. He is positive in his testimony that no one struck Glover while he was present and that he showed no signs of having been struck during the time, prior to the lineup, when the witness was out of the room. He says that he saw Glover sign the statement and then he initialled it. He says further that there were present in the room during the whole time, Detectives Keyser and Bailey, and Lt. Thomson, as well as Detective Pearson and Sgt. Bonaccorsy.

Sergeant Pearson, who transcribed the confession, says that he had no conversation with Glover before the lineup, except to ask him whether he was the man they were looking for, and that there were present in the room, after the lineup, Lt. Thomson, Sgt. May, Sgt. Bonaccorsy, Sgt. Bailey, Detective Sgt. Keyser and himself, as well as Lucian Woolley. He says that the appellant, after being questioned for about a half hour, said: "I might as well tell you the truth. The girl put the finger on me." He then gave an oral statement. Sgt. Pearson asked him to give a typewritten statement. He agreed. At that point, Sgt. Pearson (the other witnesses all agree) says that there was read to Glover the heading of a regular statement form, which says: ". . . I have identified myself to you, and you know I am a police officer. You are now requested to make a statement of the facts in this case to the best of your knowledge; however, you are advised that you are not compelled to make a statement, are not promised anything for making one, and do so of your own free will. If necessary, the statement you make will be used against you in court." He says that Glover answered that he would make such a statement, and that then he took the confession down on the typewriter. He saw Glover sign the statement. Glover was asked whether he could read the statement well enough to understand it, and answered no. It was read to him by Lt. Thomson and he then signed it and it was witnessed by the officers who were present. On cross-examination, Pearson was asked whether he had struck Glover, and he said that he had not. He was then asked: "And you claim he freely and voluntarily signed this, is that right?" His answer was: "He did after being identified". He was asked whether the statement wasn't made: "It is best to go ahead and get it off your chest", and he says that nothing like that was said by anyone. Judge Digges asked Pearson what other conversation he had with Glover until the identification, and he answered: "Just a general conversation. I mean, nothing about

the case because I don't believe Sgt. Thompson and Officer Wiseman and myself knew enough about the case to talk to him about it." The Judge then asked whether Glover was locked up at any time, and Sgt. Pearson replied: "No sir. He was always upstairs in the Detective Bureau with Sgt. Thompson and myself and Officer Wiseman. And Lt. Thomson and Sgt. May came and we released him to them." Judge Digges next asked him: "Did you hear any officer offer him any inducement in connection with that?", and he replied: "No sir."

Sgt. Keyser agrees generally with the testimony of the two previous witnesses, and says that he saw nothing done out of the ordinary or anything done that should not have been done during the whole time. He was asked how was the statement given. and he said: "Voluntarily, orally", and that it was in the words of the accused.

Sgt. Bonaccorsy of the Washington police force, substantiates the general testimony of the witnesses as to what occurred, except that he did not arrive in the room where the interrogation was taking place until some fifteen minutes after it had started, but he was there before the confession was actually given, this being some fifteen or twenty minutes after he arrived. He saw nothing unusual or out of the ordinary during the time he was there. He was asked in what manner Glover gave the statement, and he said: "Freely and voluntarily." He saw the statement signed by the appellant. On cross-examination, he described the taking of the statement as: "It was routine like any other statement that I have taken." The oral statement he heard given was consistent with the written statement which was taken later.

Sgt. May, who brought Gertrude Mackall to Hyattsville, corroborates the other witnesses. He adds that the confession was made voluntarily, and that he did not tell the appellant that he could do himself a lot of good if he made a clean breast of it, and that nobody

else made any such statement.

Sgt. Bailey testified merely to the giving and signing of the confession, without adding to or detracting from the outline of what occurred as given by all of the other witnesses.

Lt. Thomson is in agreement with the prior witnesses as to the manner of taking the confession and what occurred. In response to the question: "Was anything done to him by any police officer or anything?", he replied that nothing whatsoever was done. He testified, as did the others, that the only police officers who came in contact with the appellant until the statement was made, were those who have been enumerated.

We think that the trial court correctly decided that the State had met the burden of proof of showing that the confession was freely and voluntarily made. A review of Glover's testimony lends substantial support to this conclusion.

Actually, his defense to the validity of the confession was in the alternative. First, he said that he neither made nor signed any confession, and then, that if he did, the confession was exacted from him by coercion and duress. His testimony is that he refused to talk at all in the cell, where he claimed he was slapped with a rubber hose. He refused to talk at all when taken upstairs, either when Woolley was brought in or when he left the room for the fifteen-minute interval. He claims that when Woolley returned to the room, after the identification had been made in the lineup, he talked to the extent of telling where he was from. He then said: "After I wouldn't talk then the Sergeant from this Hyattsville Police Station, he said, 'Give me the typewriter, I'll take down a statement'. So he sat there, and Lt. Thomson, he dictates to him, to fill out the statement." He says that he didn't sign the statement that Lt. Thomson had dictated so they then slapped him and grabbed his hand, and because he didn't have the strength to hold the pen, one of the officers: "Took the pen in his fingers and then he writes with the movement of the

action of my arm. He told me, 'We got it this way, that's enough'." The confession itself contains definite refutation of this version of what occurred. If the police had dictated the statement, it is only reasonable to assume that they would have said that the murder weapon was the hammer found in the car. The type of wound and the fact that the hammer was found in the car would make this entirely logical. However, the confession says that the weapon used was the butt "of a heavy pinch pliers". Again, in the confession, Glover told them he had taken money from the filling station, saying: ". . . all the white money was in a bag, all the pennies was in a bag and all the green money was on top of the cash register. I put all the green money in my right jacket pocket, all the white money in my left pocket, . . ." The term "white money" is not one ordinarily heard or customarily used. In his testimony on the stand, Glover, when asked about the money he had taken, repeated several times that he didn't take the pennies but he took the "white money". It is difficult to believe that the phrase in the confession is not his. When asked about his education, Glover says in the confession that most of it was received at home because his grandmother was a school teacher. It is not reasonable to suppose, in the comparatively short interval, that the police could have discovered this fact unless Glover had told it to them.

Glover's second version of the obtaining of the confession is an untenable as the first. To have accepted it, the trial court would have had to reject the testimony of six police officers and of Lucian Woolley, all of whom testified to substantially the same facts. It is to be remembered that the witnesses were excluded from the Court room until they had testified, and remained in the Court room after they had finished their testimony. Glover himself says definitely that he refused to make any statement whatever until after Woolley had returned to the room after the lineup, and he then talked only to the extent of giving his name and where he was

from, and this only after he had been given a third degree. It is incredible to think that the police, if they had used the methods ascribed to them by Glover, would have done so in the presence of Woolley, particularly, when it was unnecessary for him to remain in the room once he had made the identification, and since it is admitted that he left the room for a short interval, and could have been excluded indefinitely.

We think the Court below justifiably accepted the testimony of the policemen and Woolley, that after Gertrude Mackall and Woolley had identified the appellant, he felt it was useless to hold out any longer, and gave the confession in the manner all of the State's witnesses say it was given.

There is no credible evidence of any facts or conduct which would render the confession inadmissible. A comparison of the length of time of the detention, the duration of the periods of questioning, and other relative factors in the cases of *White v. State,* 201 Md. 489, 94 A. 2d 447, *Edwards v. State,* 194 Md. 387, *Grear v. State,* 194 Md. 335, 71 A. 2d 24, and *James v. State,* 193 Md. 31, 65 A. 2d 888, show that the confession in this case was obtained in circumstances far more favorable to the accused than were those in the cases cited, in all of which the admissibility of evidence was upheld.

*Judgment affirmed.*