## GREAR *v.* STATE

[No. 72, October Term, 1949.]

*Decided January 13, 1950.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*T. Barton Harrington* for the appellant.

*Kenneth C. Proctor, Assistant Attorney General,* with
whom were *Hall Hammond, Attorney General, J. Bernard
Wells, State's Attorney for Baltimore City, William J.
O'Donnell* and *James F. Price, Assistant State's At-
torneys,* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a conviction of murder in the
first degree and a sentence of death, after trial before
two judges without a jury. About half past six on Sun-
day morning December 12, 1948 Patrolmen Arnold and
Mike were shot on Little Pine Street, an alley, between
Biddle Street and Greenwillow Street. On December
30, 1948 Arnold died of his wounds; Mike recovered.
Mike and Mary Alston, a woman whom appellant, Grear,
had picked up on the street a little after two the same
morning and with whom he had gone from place to
place the rest of the night till the shooting, testified that
they saw Grear shoot Arnold and Mike.

At the argument appellant urged that this court review
the sufficiency and weight of the evidence of premedita-
tion, because under Rule 7(c) of the Criminal Rules of
Practice and Procedure, adopted December 7, 1949, these
questions can be reviewed in cases tried since January
1, 1950. Manifestly Rule 7(c) gives no authority, and
we have no other authority, to review these questions
in a case to which the rule is expressly inapplicable.
*Cf. James v. State,* 193 Md. 31, 46, 65 A. 2d 888, 894.

The only other question raised at the argument or in the briefs is the admissibility in evidence of a statement —a confession—signed by Grear, dated December 12, 1948, 11:30 P.M., the typewriting and signature of which were not in fact completed until about 1:30 A.M. on December 13th.

Grear was born in Oklahoma in 1906 and has lived in Baltimore since 1927. He can read and write; he went to school to the sixth grade. He was arrested on Camden Street about 8:55 Sunday morning December 12th, and taken to the Western Police Station, but not before the magistrate there. He arrived there about 9:10; the magistrate was there, available; he could have been taken before the magistrate. He was put in a cell for about fifteen minutes then taken to the Northwestern Station, where he was "docketed" or "booked" at 9:45, but not taken before the magistrate there. When he was brought in, Magistrate Fitzpatrick saw him, he passed right by the magistrate but was not arraigned before him that morning; he could have been, the magistrate was available. Lieutenant Burke of the Northwestern District says he was not arraigned because there was an investigation to be made; the express purpose of the Police Department in not taking him before the magistrate was to investigate the case and obtain from him, if possible, a statement. Captain Feehley of the same district says the reason he did not arraign him was that he was not sure he was the man who shot Arnold and Mike; he did not have any corroboration, only Mike's word; the real reason was, not the fact that he wanted to question him and get a statement from him, but that he did not think he had his case properly prepared to put before the magistrate. He questioned Grear at one o'clock Sunday afternoon because he had reasons to believe he had shot these officers and felt it his duty to get as much information from him to present to the court as possible "for the time of the trial".

About ten o'clock Grear was brought into Feehley's office. Feehley had a line-up of eight men. The Alston

woman viewed the line-up and picked out Grear. Grear was then taken to the Maryland General Hospital, where he was identified by Mike as the man who had done the shooting. He was in the captain's office about half an hour, was returned to his cell for a short time before he was taken to the hospital, was gone about twenty minutes, and was returned to his cell and remained there until about one o'clock. At one o'clock he he was taken to the captain's office and questioned about half an hour, was returned to his cell and remained there till about 8:45 P.M., when he was again taken to the captain's office, was confronted by the Alston woman and remained there about five minutes. He was taken back to his cell, remained there until about 10:45 P.M., was again taken to the captain's office and stayed there till about 1:30 A.M., during which time he was questioned by the captain, and the questions and answers were taken down on a typewriter by a station house matron (who was a slow typewriter) and the statement was signed by him. He was arraigned before the magistrate at the Northwestern station about four o'clock Monday afternoon December 13th 1948, was committed and went to jail that day.

The testimony of some thirteen witnesses, captain, lieutenants, sergeants, patrolmen, turnkeys, chauffeur, patrol wagon man, and matron, purporting to be all the members of the police force who had any contact with Grear from the time of his arrest until 1:30 Monday morning, uncontradicted except by Grear, is that his statement was given voluntarily, and was not obtained by force, violence, threats, inducements or coercion of any kind. When he was arrested, he drew his revolver on one policeman and was knocked down in the street by another policeman.

Grear, testifying only as to the admissibility of the confession, tells a story which is flatly contrary to the other evidence and, if true, clearly shows that the confession was obtained by physical brutality and violence and threats of worse and is inadmissible.

Grear says he first got to the Northwestern Police Station about 9:45. "When I went to the Police Station that morning they placed me in a cell. I stayed for about five minutes. After that five-minutes stay they taken me out and carried me into a room which I later learned was the captain's office. This room was used for third degree purposes. When I first started in this room there was eight men on each side of the door in a line. After I got in and the man closed the door behind me, I was knocked from one side of the line directly to the other, all the way down till I got to the last man. I was also handcuffed in this position. I could not block any licks or defend myself whatsoever. At that particular time they beat me for about fifteen minutes, when they used eight men. Four men gathered around the chair. I was setting in a chair something like one of those chairs there, and I was handcuffed. One man stood in front of the chair, one in back of the chair, and one on each side. Well, they punched my head and shoulders like you would a punching-bag, I will say, for about fifteen minutes. After that they sit down, and had a rest and smoke, and four more men got up and took over, which carried on for about seven minutes, and they said, 'This is a hard job, he can stand more beating than a Missouri mule.' Said, 'Take him back and throw him in the cell.' That was the first time.

"I stayed in there about five or ten minutes, maybe. I didn't have a watch. And they taken me back, and employed the same brutality, with eight men. Later on in the day these men had to return to their active duty, on beats, etc. That only left three men in the Police Station excluding this Captain Whitely, or whatever his name is, and he taken the place of the four men. So they had to sit me in the chair in front of the desk, and slide the desk to one side. Well, he being a man of quite a good bit of age, he didn't strike so many licks, but every now and then he would give me a straight jab in the mouth. So this lasted for about

twelve minutes, and they taken me back and threw me
in the cell, and I stayed in the cell, I guess, till about
five minutes.

"Well, this continued for the whole entire day. The
worst beatings I got of all was when the Police Depart-
ment would be changing shifts. That is when they
would line up sixteen men to a side in this room, and as
I walked through they kept me going in this position, and
the men was too close to me, I couldn't fall, the man
striking me on this side and the other fellow would re-
bounce the blow back to the next man. That worked
all the way down to the end of the line. After this
went on all the way down to the end of the line, this
lieutenant that was in charge—* * * the lieutenant on
the day shifts, * * * 8 to 4, * * * Lieutenant Burke,
suggested that they form a ring in the room. * * * They
formed a large circle, put me in the circle, and after
they put me in the circle, each man held out his hands
arm-length, and they closed in within six inches of arm-
length; that give each man a perfect striking power.
And they kept me reeling and rocking backwards and
forwards in this ring for about fifteen minutes. Well,
I become to be punch drunk and fell out. Well, I got
up, and when I got up oh my feet this lieutenant suggest-
ed that to sit all the men down, put me back in the chair,
and use eight men, two in front, two on each side, and
two in the back. Well, this lieutenant himself stood to
the left-hand side of me, * * * the same Lieutenant Burke.
And at that time—this man was I know well over 200
pounds—he struck me on the left side near the butt of
the head, and he knocked me, chair and all, over at that
time. One of those type of chairs is hard to knock over,
because the legs sit caterbox, in this position. So the
man must have hit me a terrible blow. When I fell
I fell right underneath another policeman's feet. One
policeman struck at my head, missed me and hit the
other policeman in the mouth. So then they decided eight
men was too many men to beat on one man at one time.
So the lieutenant decided to make four of them sit down.

Then four continued for several minutes. * * * That was in the morning, * * * I would say about 11 o'clock."

The same brutality continued during the afternoon, and during the night the same way. He heard Captain Feehley and Lieutenant Ernest testify that he was there in the room with them from about 10:45 Sunday night until 1:30 Monday morning, December 13th. During those hours things like that took place. Lieutenant Ernest "is the man that struck me in the back of the spine, and I have a knot there to show that will be on there till I go to my grave, a fracture of the spine. That is not a natural knot". [No objective evidence was offered regarding this "knot" or "fracture".] He was questioned "about thirty-six times" between one o'clock in the afternoon and 8:30 or 9 when he was brought before the Alston woman in the captain's office. He did not sleep at any time from 9:45 Sunday morning, when he was brought into the station, until the statement was signed at 1:30 Monday morning. "They didn't give me a chance to sleep, when they taken me back to this cell, I was in so much pain and agony—whoever was handling the food brought coffee and they also brought hot dogs—my throat and neck were swollen so I couldn't eat the hot dogs, and I couldn't drink the coffee. * * * Lieutenant Burke said, 'Make the black so-and-so confess or kill him. If you fellows are afraid to do it, I am not.' That is what he said. * * * Lieutenant Ernest * * * threatened me, and he said, 'I will make you confess, because I have handled a lot of your kind.' He said, 'I know just what to do with you,' he said, 'knock your brains out.' And that is when the man struck me with the stick across the head, and knocked me almost unconscious, and I got up as far as my knees; they had to pick me up. * * * [It was] a regular officer's pantoon. * * * Captain Freehley didn't make any threats. He only hit me about twelve licks at different times. He was sitting down in the chair, and would just reach over and hit me in the mouth like that. * * * I was sitting in

the chair when he was carrying me through, because there was only three men, and he didn't want to stand."

No police officer advised him that he did not have to answer any questions he was being asked or told him he was not obliged to talk to them at all in connection with this shooting affair; "they told me I must tell the truth how the case begin, how it started, and everything, and if I didn't tell the truth or didn't confess to the crime, they were going to beat me to death." They did not tell him he was entitled to have the services of a lawyer to advise him in connection with the charges about to be brought against him. "They even objected of [sic] me calling my wife so I could get an attorney." "On the night of the 13th" [sic] he asked Captain Feehley for permission to call his wife. "I said to him 'Captain Feehley, would you grant me permission to call up the grocery store in the neighborhood where my wife lives, and she can come up and get me an attorney. In that way they would help me a whole lot.' He said, 'No, you can't call anybody.' * * * I signed a statement after thirty-six hours of brutality, after being in the Station House thirty-six hours and a half—* * * Q. * * * Did you sign the statement at 1:30? A. Well, at that time I could not be definitely sure about the time of the night, because I had been knocked out twice, unconscious, and they left me lay in this room each time till I gained consciousness. That was after the second unconscious blow, and I am not sure what time it was when I signed the statement." He did sign the statement, but at the time it was signed he had not first read it. At the time he was asked to sign, he was not advised that he did not have to make any statement or that he could have the services of counsel before signing. Before he signed the statement he asked to call a named lawyer, whom he knew, and they refused to grant him permission. "I signed the statement simply because I am only a human being, and I could not stand any more of the brutality. I knew that I had been previously wounded in several accidents, and I have been shot direct-

ly through the brains. I had been also knocked three times unconscious in the Police Station and left in this room to regain consciousness the best way I could, not even was offered a glass of cold water at that time, and I knew I could not stand the amount of brutality that I had stood already." He was shot through the brain in 1914. "I signed the statement simply because I knew I couldn't stand the brutality that I had went through, and they had threatened to keep it up until I confessed. * * * I did not sign it freely and voluntarily." He was in fear at the time he signed it; he was forced to sign it.

On cross-examination Grear said he did not remember hearing the question asked, (which is answered in the affirmative in the signed statement), "I want you to realize what you say must be free and voluntary on your part, and whatever you do say may or may not be used against you in court at the time of your trial. I cannot promise you anything, and I want you to understand that I am not threatening you in any way. Are you willing to tell me what you know about this case?" He remembered Captain Feehley repeating the question, "Now, Edward, you have made this statement of your own free will, without any threats or promises or inducements of any kind, and after you read it, will you sign it?" (which is the last question in the statement and is answered in the affirmative), "but the question that he asked was not answered, because he didn't ask me those questions one particular time. The lady took the stand here and she stated definitely that I only was asked those questions one time. The copies of those questions was written more than seventy-five times before they could get them straight. * * * More than seventy- five times. There was a pile of papers in the waste-basket * * * about a foot and a half deep." That all took place between 11:30 and 1:30 while he was in the captain's office; "that was all that took place, this brutality, they kept it up". When he was taken into the captain's office about 8:45 P.M. and the Alston woman was there, and the woman sitting at the typewriter, he

was not beaten. "They didn't beat me in the presence of the lady". He was in there that time about half an hour. At night while they were taking the statement, "they didn't beat me in there while the lady was in there. They took me out and carried me back to the cell, and when they bring me back the next time the lady and Captain Feehley both would be gone, that is when they would work on me." These sixteen men were in line and beat him back and forth one side to the other "when the Police department would be changing shift, some coming in and some coming out. * * * That was about 11 o'clock, I would say, the gang would come on from 11 to 3. * * * The captain was only in the room three times, but I don't know just what hour or what time he was in there until that night." In the morning when he was at five minute intervals bounced back and forth, the captain wasn't in there at all then. This happened after he came from the hospital. He stayed in the captain's office about ten and fifteen minutes intervals. Between these intervals they took him out to the cell and brought him back. He went back with the first turnkey "about thirty-five times" between the time he was brought into the Northwestern and the time the turnkey "changed shift". While the next turnkey was on duty, "up until I was knocked unconscious the second time between the two shifts, I counted thirty-five times altogether" that he went back and forth from the cell. While the third turnkey was on duty, "after that point I had been knocked unconscious, and I lost count of how many times they really took me in but I know they used to carry me in every two or three minutes. I didn't stay in the cell any more than two or three minutes at a time." He went before the magistrate on Monday afternoon, the 13th, was held in bail for the action of the grand jury, and went to jail. It was before he saw the magistrate that he asked the captain about letting him see his wife. He was in pretty bad shape after all this beating; "I was in a terrible bad shape"; he was in that bad shape when he was before the magistrate; he did

not call the magistrate's attention to it, "because I was instructed not to say nothing unless I was asked a question." He remembers "waking up in jail, and the man said to me, 'Come on out and get in the doctor's list, because you are in pretty bad condition.' I said "O. K." He didn't mention "the man's" name and does not know the name of the doctor who saw him and gave him a small vial of medicine to mix and to wash his head.

Captain Feehley says that when he questioned Grear he did tell him he did not have to answer any questions; he did not tell him he was entitled to have counsel; he did not attempt to get in touch with Grear's wife; he told Grear he could get her. "I think she came the next morning, after I told him he could talk with his wife. He said he would like to talk with her. * * * that was that night, I think, and she didn't come until next day." He did not permit him to get in touch with his wife before he took the statement—"I probably would have if he had asked me, but he didn't ask." Grear did not ask to phone his wife.

Grear's wife, Elizabeth Grey, goes by the name of Grey or Grear (which she prounces Grill); she says, "Some call him Grey; some call it Grear". Before nine o'clock Sunday morning a policeman came to her house and told her her husband had been arrested. About 1:30 P.M. she telephoned the Northwestern station and asked if they had "a fellow there named" Grey and was told they had not. She "didn't do no more calling [by telephone] before Monday." About two o'clock on Sunday she was told that his arrest had been broadcast over the radio. She went to see him on Monday about 2:30 P.M. at the Northwestern station. She could see his face. On examination by his counsel, she testified, "Q. What was the condition of his face? A. He had been beaten, he had a scratch on his face up along here. [When he was knocked down at the time of his arrest, he might naturally have sustained a 'scratch' or other mark of a fall.] Q. Did he make any statement to you about any beating? A. No sir."

A nurse at the Nurse's Clinic at the jail testified that Grear first came to the dispensary on December 14, 1948; he got some liniment "to rub himself with"; "at that time he said he was beaten up by the policeman, but we couldn't find any marks on him; we did no dressing on him whatsoever"; he said he was stiff in his joints and the liniment was to be used to rub his joints; no marks of violence whatever were noticed about him; he said the police beat him up to get a confession out of him; the next time he came on sick call was on December 20, 1948 on account of a cold.

Grear's description of the captain's office, "the room used for third degree purposes", and its contents was quite different from Captain Feehley's description, and was not corroborated, as it readily could have been, if true.

Grear was indicted for murder on January 14, 1949. The court appointed counsel for him. He was arraigned and pleaded not guilty on January 17, 1949. There is no evidence that before appointment of counsel by the court he made any effort after he went to jail on December 13th, to procure or consult counsel.

We are not confronted with the possibility that a lone prisoner may be telling the truth and thirteen policemen telling falsehoods. Regardless of the number of opposing witnesses and the fact that we have not seen or heard the witnesses, Grear's story on its face is impossible. He could not be tortured for thirty-six hours between eleven in the morning and half past one at night, or by bands of sixteen or thirty-two policemen in a place where there were only three. "Changing shifts" could not take the full time of one eight-hour shift and also several hours before and after. Nor was there time for seventy——or thirty-five——twelve to twenty-two minute sessions at five or ten minutes intervals. When brutality to the prisoner yielded to chivalry toward "the lady", the captain and "the lady" could not disappear from the room where for two or three hours he was questioning Grear and she was filling the wastebasket with seventy-five

348

drafts of the statement she was typewriting. By Grear's
first account the captain was a leader in the brutality;
by the last version he was only in the room three times.
Hours of brutality must have left marks and memory.
Grear did not tell the magistrate or his own wife he
had been beaten; he told jail attendants, but the nurse
saw no evidence of it.

Grear now contends that on the State's evidence it
was the duty of the police officer who arrested him "to
take [him] to the nearest station-house", and of the
justice of the peace sitting at the stationhouse to "take
jurisdiction in said case" (P. L. L., Art. 4 (1938 Ed.),
sec. 742) ; he should have been "taken by the officer mak-
ing the arrest immediately before the nearest police
justice for examination" (id., section 916) ; each justice
selected to sit at each station-house shall attend——and
on December 12, 1948 those selected for the Western and
Northwestern Districts did attend——at such station-
house from 9 A.M. until 11 A.M. on Sundays and "sit
to hear, try and determine cases and to perform all the
duties which he is required by law to perform" (id.,
section 722) ; he was unlawfully held, without being
taken before a magistrate, from nine o'clock Sunday
morning until four o'clock Monday afternoon; and the
confession obtained from him while he was so unlawfully
held is inadmissible. For present purposes, we see no
material difference between section 742 and section 916
or between the testimony of Lieutenant Burke and Cap-
tain Feehley as to why Grear was not immediately
taken before a magistrate. One reason, if not the only
reason, was the desire to get a confession first. Lack
of sufficient evidence to hold him could not be a valid
or pertinent reason. Lack of evidence to hold him
lawfully manifestly could not justify holding him un-
lawfully. We do not, however, mean to suggest that
the police did not have sufficient evidence to hold Grear,
or that in any case a duty to take a person arrested im-
mediately before a magistrate for examination implies
a right to be immediately discharged unless the state

then and there produces testimony which would be sufficient to hold the prisoner after a full preliminary hearing or a full hearing on *habeas corpus*. Like other legal proceedings, preliminary hearings may for sufficient reasons be postponed or continued, certainly when two witnesses, one at least an eye-witness, are in a hospital. *Brish v. Carter*, 98 Md. 445, 449, 452 A. 210.

So far as Maryland law is concerned, the instant case is governed by *Cox v. State*, 192 Md. 525, 64 A. 2d 732. and *James v. State*, 193 Md. 31, 65 A. 2d 888. In the *Cox* case (followed in the *James* case) we held that the fact that evidence has been obtained unlawfully does not necessarily make it inadmissible, and that unless the facts show that the illegal arrest in itself constituted such duress as to make the confession involuntary, the same rule as to admissibility of the confession is applicable as where the arrest is legal. We need not again rehearse the facts in those cases and the instant case. From a comparison of the opinions it is obvious that (disregarding, as we must, Grear's story as incredible) there is less in the facts of the instant case to support a charge of duress, physical or psychological, than there was in either of the cited cases. To mention only one circumstance, the period between the arrest and the confession is shorter and the number and duration of questionings is less.

Grear contends that the instant case is governed by *Watts v. State of Indiana*, 338 U. S. 49, 69 S. Ct. 1347; *Turner v. Commonwealth of Pennsylvania*, 338 U. S. 62, 69 S. Ct. 1352; and *Harris v. State of South Carolina*, 338 U. S. 68, 69 S. Ct. 1354, all decided June 27, 1949, since the decision of this court in the *Cox* and *James* cases, and that on the authority of these three cases the circumstances under which Grear's confession was procured render admission of it as evidence a denial of due process. Of course, if this is the effect of these cases, they are binding on us, regardless of our own previous decisions. We do not so understand these cases. In each of them a conviction, affirmed by the state supreme

court, was reversed for denial of due process in admitting a confession in evidence. The Supreme Court divided into five (or six) factions. In a brief statement three justices said each of the judgments should be affirmed. In a full opinion another justice concurred in the *Watts* case and dissented in the other two. 69 S. Ct. 1357. One justice said that "any confession obtained during the period of unlawful detention" should be "outlawed". In each case Mr. Justice Frankfurter's opinion, the only one (except the statement of three dissenting justices) which spoke for more than one justice, expressed the marginal view of three justices necessary to the decision. These opinions of Mr. Justice Frankfurter do not mention any of the prior cases on the ultimate question involved. They purport not to overrule the prior cases, but to apply them by "measuring the circumstances under which petitioner's confession was made against the circumstances surrounding confessions which we have held to be the product of undue pressure". 338 U. S. 70-71, 69 S. Ct. 1356. In the *Harris* case he said, "The systematic persistance of interrogation, the length of the periods of questioning, the failure to advise the petitioner of his rights, the absence of friends or disinterested persons, and the character of the defendant constitute a complex of circumstances which invokes the same considerations which compelled our decisions in *Watts v. State of Indiana*, 338 U. S. 49, 69 S. Ct. 1347, and *Turner v. Commonwealth of Pennsylvania*, 338 U. S. 62, 69 S. Ct. 1352." 338 U. S. 71, 69 S. Ct. 1356. In each case "the systematic persistence of interrogation" and "the length of the periods of questioning" were outstanding, apparently essential, parts of the "complex of circumstances", and were not comparable with the facts in the instant case——or in the *Cox* or the *James* case. In the *Turner* case it was admitted "that a hearing was withheld until interrogation had produced confession" (338 U. S. 64, 69 S. Ct. 1353). But this circumstance was not held decisive. Perhaps when it is not admitted it is usually obvious that this is

the purpose of such delay. "There is torture of mind as well as body; the will is as much affected by fear as by force. * * * A confession by which life becomes forfeit must be the expression of free choice. A statement to be voluntary of course need not be volunteered. But if it is the product of sustained pressure by the police it does not issue from a free choice. When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the suction process of interrogation and therefore the reverse of voluntary." 338 U. S. 52, 53, 69 S. Ct. 1349. In the instant case we find no such undue pressure as would constitute denial of due process.

*Judgment affirmed, without costs.*