SOLOMON BIRKENFELD *vs.* THE STATE OF MARY-
LAND.

*Criminal Law—Confession Held to be Voluntary.*

A statement made to a police officer who arrested the defendant for mur-
der in reply to a question assuming that he killed the deceased is ad-
missible in evidence as a voluntary confession when it appears that no
threats or promises were made by the policeman.

The fact that a confession was made by a foreigner whose vernacular is
not English does not render it inadmissible when it is shown that he
was aware of his situation and could speak English fairly well.

On cross appeal.

On a trial for murder where there was no evidence that the deceased
threatened any violence to the traverser at the time of the homicide,
evidence as to the habits of the deceased in regard to drinking liquor
is not admissible.

*Decided November 2nd, 1906.*

Appeal from the Criminal Court of Baltimore (HARLAN,
C. J.)

The cause was argued before McSHERRY, C. J., BOYD,
PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*James J. McNamara* and *W. P. J. Murray*, for the appellant.

*Eugene O'Dunne, Deputy State's Attorney* (with whom were
*Wm. S. Bryan, Attorney-General* and *Albert S. J. Owens,
State's Attorney* on the brief ), for the appellee.

PEARCE, J., delivered the opinion of the Court. .

This record presents cross appeals from the Criminal Court
of Baltimore City.   The appellant in No. 25 was indicted for
the murder of his brother, and was convicted of murder in the
second degree, and sentenced to confinement in the peniten-

tiary for fifteen years. Two exceptions were taken by the traverser, each of which was to the admission of his own statements as to the reason why he shot his brother on February 27th, 1906.

The traverser was a native of Russia, sixteen years of age, who had been in this country about two years, and who understood and spoke the English language imperfectly.

He testified in his own behalf, through an interpreter, that beginning about Christmas, 1905, the deceased, who occupied the same room and bed with him, had frequently attempted to commit the crime of sodomy upon him, and that he shot his brother in the effort to resist the commission of that crime; that he was a tailor by occupation and lived in Baltimore on Albemarle street; that he had never been to school except in Russia, and his only instruction there was in the Hebrew language; that he did not understand the English language, and could only speak some simple words of that language, and that he had not talked in English with warden Noonan of the city jail.

Warden Noonan testified that he had once or twice talked with the prisoner while he was in jail, and he replied in English; that he had that morning asked the warden to take him to the toilet, to give him a drink of water, and to let him take one of his oranges into Court; and that when Dr. Keirle came upon the stand he asked if he was a doctor; and also that he had seen the prisoner talking with a colored man who could speak only English. Officer Steinberger testified that he had a general conversation with him in English while he was in jail, and that when he asked him something about his case he replied, "you will have to see my lawyer."

Sergeant McGlynn testified that on February 27th, about half past seven in the morning, he was on Albemarle street at No. 16, and learned a man had been shot there; that on going up stairs he found Abraham Birkenfeld in bed with blood all over the clothes; that the traverser was standing in the next room, and he asked him why he had shot his brother, and he offered the pistol which was in his pocket, to which the wit-

ness replied, "never mind, keep the pistol in your pocket." McGlynn further testified that when he asked the traverser about the shooting, he was under arrest and on the street about thirty feet from his house, and that no inducements were offered or threats made to make him say anything, and this was confirmed by Sergeant Keneally who was present from the first, and heard all that passed. Sergeant McGlynn was then asked the following question: "When you asked Solomon Birkenfeld why he shot his brother, what did Solomon Birkenfeld say to you?" Objection was made to this question, but the objection was overruled and the witness answered, "Because he fights me all the time."

Officer McGlynn testified that he took the prisoner down to the station house upon his arrest, and that while on the way he told him the same he told Sergeant McGlynn. He was then asked, "What did you say to him and what did he say to you?" This question also was objected to, but the objection was overruled, and the witness answered, "He said his brother and he had been fighting, and his brother went and got two boys to lick him on Saturday night previous. I said what did you shoot him for, and he said he shot him on account of that. I said where did you get that pistol at? And he said I got it out of my brother's pocket. I said, who does it belong to, your brother? and he said, yes." This witness also testified that the traverser told him on the way to the station house there was no one in the room but his brother and himself; also that when he and McGlynn went into the room where the wounded man was lying on the bed, that he was in his night clothes, which were pulled up upon his person, and that the traverser was in the next room, ready dressed with his cap on his head, and standing alongside the bed.

The two exceptions thus taken present but one question, viz, whether the confessions were free and voluntary, and therefore admissible as confessions.

It will be seen from the testimony, which has been substantially recited in full, that the State discharged the burden of

showing by affirmative proof that these confessions were not obtained by any improper means. It is conceded by the appellant, and settled upon authority, that a confession cannot be excluded as not free and voluntary, merely because it is made in reply to a question assuming guilt, unless the question is designed, or so framed, as to trap the accused and inspire hope or fear. *Ross* v. *State*, 67 Md. 288; *Green* v. *State*, 96 Md. 386. In the latter case, the circumstances were stronger than in this. There, a Justice of the Peace went to the place where the prisoner was lying, after shooting a woman, and immediately afterwards shooting himself. The Justice asked him if he was willing to give a statement, to which he replied that he was. The Justice then asked him "why he shot Carrie Price," and he said, "he shot her because she would not do as he wished, and that he went and got the pistol on purpose to shoot her with it."

It is also settled that the fact that the confession was made to one in authority, such as the police officer who arrested the accused, or the examining magistrate, will not warrant its exclusion, if freely and voluntarily made. 12 *Cyc.*, 462. In Green's case, *supra*, the confession was made to the examining magistrate. In *Nicholson* v. *State*, 38 Md. 140, it was made to the Chief of the Detective Department of Baltimore, while the prisoner was under arrest and in the custody of the assistants who had made the arrest, and while at the district station house; and in *Ross* v. *State*, 67 Md. 286, to the Marshall of Police, while in the custody of the officer who made the arrest. It has been held in *Franklin* v. *State*, 28 Ala. 9, that the fact that the prisoner's hands and feet were tied at the time would not alone require exclusion of the confession; and the same was held in *State* v. *Whitfield*, 109 N. C. 876, where the accused was handcuffed at the time. See also cases cited in 12 *Cyc.*, 466. We are not required to go to this extent here, but without committing the Court either way, we may say that such circumstances should be fully inquired into with a view to ascertain from all the facts whether this rigorous physical restraint operated by way of duress.

The appellant's counsel did not deny that the authorities are as above stated, but very earnestly contended that in view of the youth, nationality, education, previous training, mental qualities, and surroundings of the prisoner, the question put to him by Sergeant McGlynn was calculated to entrap him. The evidence shows that he was old enough to understand his situation fully, that he was an intelligent boy, and could understand the English language fairly well, and communicate by its means readily with others. The fact therefore that he was a native of Russia or of any other foreign country, speaking a language different from our own, cannot relieve him from the consequences of his voluntary statement.

There was no error in the ruling on these exceptions, and the judgment will therefore be affirmed.

*Judgment affirmed, the appellant to pay the costs.*

On cross-appeal by the State.

PEARCE, J., delivered the opinion of the Court.

This is a cross-appeal in the case just decided, and was taken from a ruling of the Court upon the admission of evidence over the objection of the State thereto. The appeal was taken in accordance with the construction given by this Court in *State* v. *Shields*, 49 Md. 301, to ch. 316 of the Act of 1872, now sec. 80 of Art. 5 of the Code of Public General Laws of Maryland. Under that decision "the Court of Appeals is required to notice exceptions by the State in criminal cases, on appeals by the State, only in cases where the parties accused have been convicted, and have also taken exceptions and appeals. In such a case, if it is found there was error in the rulings excepted to by the accused, so that a new trial can be awarded him, it will then become the duty of the Court to consider and determine all the questions raised by the State on its appeal, so that in the new trial the Court below can be guided by the judgment of this Court on all such questions, as well as on those raised by the appeal of the accused."

In the case now before the Court we have found no error

in the rulings brought under review by the appeal of the accused, and therefore no new trial can be awarded him. It would be idle to *require* the Court to consider and determine a question which under no circumstances could be again considered in the Court below, and we do not understand the counsel for the State to contend otherwise; but the learned Attorney-General, and the State's Attorney and Deputy State's Attorney for Baltimore City have in their brief stated that they regard the question sought to be raised by this exception as a matter of public interest, as there are several murder cases awaiting trial on the docket of the Criminal Court, and their experience in the past leads them to expect a proffer of like evidence in the future, and they have requested us for these reasons to state our views upon the question, which we have consented to do briefly.

While the traverser was testifying in his own behalf his counsel asked him, "Did your brother drink liquor of any kind from the beginning of this trouble until the shooting happened?" and, the objection of the State thereto being overruled, the State excepted, and the witnessed then answered, "There was an odor from the mouth of deceased after drinking beer or whiskey which was noticed by the witness from about a week after Christmas of last year until the time that witness shot him." Such testimony, in our opinion, not only has no relevancy to the true issue, but must inevitably greatly confuse the issue, and, if sanctioned by the Courts, would lead to most unfortunate verdicts in prosecutions for murder. There was no evidence is this case tending to show that any violence was offered by the deceased at that time to the traverser, or that he had any reason to believe or to fancy himself in any danger of his life, or of any violence whatever. Under these circumstances, as was said by the Supreme Court of Maine, in *State* v. *Field*, 14 Me. 249, "to allow evidence of deceased's habits of drinking at other times, and their consequences, could have no legal efficacy in reducing the crime of which the defendant stood charged to justifiable or excusable homicide."

Under the decision in *State* v. *Shields*, the appeal must be dismissed. *Appeal dismissed.*