PRESLEY *v.* STATE

[No. 154, September Term, 1960.]

*Decided March 22, 1961.*

*Motion for stay of execution of mandate filed April 21, 1961, granted April 25, 1961, and mandate stayed ninety days from the date of the judgment of this Court, pending an application for a writ of certiorari to the Supreme Court of the United States, and until final decision by that Court.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, HORNEY and MARBURY, JJ.

*Hugh J. Monaghan, II,* with whom were *Paul J. Reed, Jr.* and *George B. Cavanagh* on the brief, for appellant.

*Stedman Prescott, Jr., Deputy Attorney General,* and *John W. Sause, Jr., Assistant State's Attorney of Baltimore City,* with whom were *C. Ferdinand Sybert, Attorney General, Saul A. Harris* and *Julius A. Romano, State's Attorney* and *Assistant State's Attorney of Baltimore City,* respectively, on the brief, for appellee.

MARBURY, J., delivered the opinion of the Court.

Appellant appeals from a judgment entered on a jury's verdict of guilty on the first count and sentence of death upon an indictment returned by the grand jury of Baltimore City containing five counts: rape, assault with intent to rape, carnal knowledge of a girl under fourteen years of age, assault with intent to carnally know a girl under the age of fourteen, and simple assault, all upon an eleven year old girl, on January 3, 1960.

At the beginning of the trial on April 11, 1960, Judge Cullen, when the talesmen were brought into the courtroom, advised them that this was "an important and serious case" and that he had determined to sequester the jury. He then on the *voir dire* inquired whether any of the jury had such

554

conscientious scruples or opinions as would prevent or preclude them from rendering a verdict of guilty, where the penalty prescribed by law could be death, and whether any of them had formed or expressed any opinion in the case against the appellant by reason of any statement, reports from any news source or persons which would prevent them from rendering a fair and impartial verdict based solely on the law and evidence in the case. He further asked them, at the request of defense counsel, whether any of them had any bias or prejudice against any one because of race or religion, and whether any of them had ever been a complaining witness for the prosecution in any criminal case. No other questions were requested or suggested to the Court by counsel. After the response to these questions the jury was selected and impaneled, whereupon the Court took a recess for an hour and a half for the purpose of lunch and to allow time for the jurors to arrange to have clothing and other effects picked up at their homes by court officials, and to return at 1:45 p.m.

Upon reconvening defense counsel requested and was granted a conference at the Bench. He requested a mistrial on the basis that while the Jury was at lunch, an article appeared on page 1 of the Local Section of the Baltimore News-Post newspaper as follows:

### "ATTACK TRIAL TO OPEN TODAY

Trial of a 42-year-old man charged with raping an 11-year-old girl in the Parkwood Cemetery Jan. 3 was scheduled to begin in Criminal Court today.

James L. Presley, of the 400 block Warren Ave., is charged with picking up the girl in his car while she was on her way to church in Parkville after threatening her with a knife.

Police said he drove her to the cemetery, located just within the city limits, and attacked her.

They said he then drove her back to the county and let her out of the car.

Assistant State's Atty. John W. Sause, Jr. said he will ask the death penalty for Presley."

The Court stated that the defense agreed with the Court and with the State to allow the jury to go to lunch and that he had "the very specific agreement to that effect." He thereupon overruled the motion for mistrial and this gives rise to the first question urged upon this Court as ground for reversal. The general rule with respect to alleged prejudice caused by newspaper publicity has been clearly established in this State by the decisions of this Court, which is that the burden is upon the party alleging prejudice to show: (1) that the newspaper article is prejudicial, (2) that a juror has read the prejudicial newspaper article, and (3) that the jurors' decision at the trial was influenced by that newspaper article. *Gray v. State,* 224 Md. 308, 167 A. 2d 865; *Piracci v. State,* 207 Md. 499, 115 A. 2d 262; *Grammer v. State,* 203 Md. 200, 100 A. 2d 257; *Wanzer v. State,* 202 Md. 601, 97 A. 2d 914; *Larch v. State,* 201 Md. 52, 92 A. 2d 463; *Baltimore Radio Show v. State,* 193 Md. 300, 67 A. 2d 497; *Newton v. State,* 147 Md. 71, 127 Atl. 123.

We find nothing in the article inflammatory or calculated to arouse public sentiment against the defendant, nor do we find anything in it which would likely have influenced a juror's decision one way or the other. The article simply attempted to state what the charges were against the appellant. *United States v. Reid,* 53 U. S. 361, 12 Howard 361.

In support of this contention the appellant seems to rely exclusively upon *Basiliko v. State,* 212 Md. 248, 129 A. 2d 375. This argument ignores the obvious fact that in *Basiliko* the Court found the articles were prejudicial *per se*. The facts in that case are so different from those involved in this that we do not consider *Basiliko* in point.

The record fails to show that any juror read the newspaper article. When the court reconvened, and before any evidence was given, defense counsel made no request to have the court further examine the jurors on their *voir dire* as to whether or not any juror had in fact read the article. Having failed to avail himself of the opportunity to have the jurors further interrogated, the appellant can not now complain that some juror *may have* read it and have been influenced thereby.

We find no error in the Court's overruling the motion for mistrial.

The appellant's next question is whether the circumstances surrounding the police line-up were so unfair and unreliable as to preclude the admissibility of the identification resulting therefrom. A careful reading of the record and the briefs fails to disclose how this question has been preserved for review by this Court. However, the general rule as to the admission of an extrajudicial identification in a trial where the identity of the accused is an issue, is that such identification is admissible when it appears that the circumstances surrounding the same were such as to preclude any reasonable suspicion of unfairness or unreliability. *Basoff v. State,* 208 Md. 643, 119 A. 2d 917; *Judy v. State,* 218 Md. 168, 146 A. 2d 29; *Proctor v. State,* 223 Md. 394, 164 A. 2d 708. See annotations in 71 A.L.R. 2d 456; 1 Wharton, *Criminal Evidence* (12th ed. 1955) Secs. 181, 182; 23 C.J.S. *Criminal Law,* Sec. 920, p. 192.

His counsel argued that because the child victim informed police that her attacker was wearing a brown leather jacket and a red hunting cap at the time of the commission of the crime it was prejudicial to him to place him in the line-up at the police station to be viewed by the victim with five other men, one of whom was wearing a gray hat, and two others besides Presley were wearing brown jackets, when Presley was attired in the same clothes he was wearing when arrested, which included a red hunting cap and brown jacket. Lt. Kemple in describing the line-up testified that the six participants in it were dressed "as similar as we could get them at the time." Of course it would have been obviously unfair and prejudicial to the suspect to have placed him in a group of pygmies, for example. On the other hand, the police were not required to stage a masquerade by dressing all of the men in the line-up in similar attire.

In discussing the technique of identification of accused persons Professor Wigmore, in 3 *Wigmore on Evidence* (3rd ed. 1940) Sec. 786 a (B) 2 comments:

"2. The process also calls for *precaution,* in tak-

ing measures beforehand objectively to reduce the chances of testimonial error:

(a) At the time of *original observation*, the investigator (police) should obtain from the observer a note of any marks of the personality observed, so that there will be less need to depend later on the observer's memory.

(b) At the time of *presenting for recognition*, whether upon arrest or at trial in the courtroom, measures should be taken to increase the stimulus of association and to decrease the risk of false suggestion. (a) The person to be identified should be clothed and placed (so far as feasible) in the same conditions as when originally observed. (b) The person to be identified should be presented in company with a dozen others of not too dissimilar personalities."

In the instant case, we find no indication that would call for a finding that the identification was made under conditions of unfairness or unreliability. The record discloses that the victim viewed at least forty-eight slides before identifying the appellant to the police. The fact that the appellant was the only man in the line-up wearing a red cap did not in itself invalidate the line-up. Nor do we consider because he was one of 6 rather than 12, as suggested by Professor Wigmore above, that this factor violated the rule of fairness. There was searching cross examination by appellant's counsel directed to showing that the identification was made because the accused wore the same attire in the line-up as he had during the attack. Suffice it to say that we find no indication that the State took any unfair or prejudicial advantage of the accused in arranging for the line-up and that the careful and definite identification of the accused by the prosecutrix was free from any previous coaching or suggestion as to his identity. We think the evidence concerning the appellant's identification by the victim in the line-up was for the proper consideration by the jury and involved no reversible error in this case.

The third question raised by the appellant is: "Was not the evidence of penetration insufficient to justify a conviction of rape?" Without going into sordid details as to the evidence disclosed by the record, there was ample evidence of this element of the crime disclosed by the testimony of the victim, as well as that of Dr. Mansfield, and the appellant's confession, which will be hereafter discussed. We think the jury were clearly justified in reaching the conclusion that penetration had actually occurred.

The appellant also contends that the evidence of anal penetration should not have been admitted into evidence when the appellant was charged with rape.

The general rule is that evidence of another crime which the accused has committed is inadmissible in a criminal trial when it is unrelated to the crime charged. *Bryant v. State,* 207 Md. 565, 115 A. 2d 502. If, on the other hand, the evidence is such that it is so closely related to the offense charged as to form a part of a common plan or scheme, or if the other crime is so linked together in point of time or circumstances as to show intent or motive, the exclusion rule does not apply. *Bryant v. State, supra; Blake v. State,* 210 Md. 459, 124 A. 2d 273; *Ward v. State,* 219 Md. 559, 150 A. 2d 257; *Wentz v. State,* 159 Md. 161, 150 Atl. 278.

In the instant case the testimony as to the perverted act was in our opinion closely linked to the offense charged. In fact it was interrelated with the main charge. Moreover, the testimony tended to show the intent or motive on the part of the appellant so as to form a part of his common scheme of sexual gratification. Hence, we find no merit in this contention of the appellant.

The fourth and final ground for reversal asserted by the appellant is that the defendant's confessions were "involuntary", and should not have been admitted in evidence. His objections at the trial to the admission of the statements to the police seemed to be three-fold: (1) that he was denied the right to obtain counsel; (2) that he was questioned for a long period of time; and (3) that the statements were obtained by force and threats of the police officers.

It is the well established law of this State that in order for a confession to be admitted into evidence, the State must prove that it was voluntary and not a product of force, or threats, and was not the result of any promises whereby the accused might be led to believe that there would be a partial or total abandonment of the prosecution. *Hall v. State,* 223 Md. 158, 162 A. 2d 751; *Merchant v. State,* 217 Md. 61, 141 A. 2d 487; *Jackson v. State,* 209 Md. 390, 121 A. 2d 242.

The question of the voluntary nature of the confession is initially decided by the court and involves a mixed question of law and fact. If the court allows it into evidence its admission then becomes *prima facie* proof that the confession was freely and voluntarily made. Then the same evidence pertaining to the voluntariness of the confession, which was heard first by the court, is then submitted to the jury for its ultimate determination. *Hall v. State, supra; Smith v. State,* 189 Md. 596, 56 A. 2d 818; *Linkins v. State,* 202 Md. 212, 96 A. 2d 246. Furthermore, any conflict of testimony as to the voluntary character of the confession is first a question for the court, then, if admitted, it becomes one for the jury which sits as the trier of facts. *Cox v. State,* 192 Md. 525, 64 A. 2d 732; *Grammer v. State, supra.*

With respect to the appellant's claim that he was denied counsel before making the statements to the police, this may be disposed of by observing that he merely asked to make a telephone call without stating his reason therefor, but did not make the specific request that he be permitted to contact counsel. Even if this had been denied him such fact would not make the confessions inadmissible. *Driver v. State,* 201 Md. 25, 30, 92 A. 2d 570; *Day v. State,* 196 Md. 384, 397, 76 A. 2d 729. Cf. *Crooker v. California,* 357 U. S. 433.

That such a request was made was flatly denied by the police. The court and jury, if they believed this denial, may well have considered this as part of his professedly elaborate and thoughtful (if fearful) preparation of turning himself in to the police, and that he could not afford counsel in any event, as evidenced by the fact that he did not retain counsel until such was appointed for him at his arraignment. More-

over, it is well established in Maryland that lengthy questioning does not of itself make a confession involuntary. *Merchant v. State, supra,* at page 69; *James v. State,* 193 Md. 31, 65 A. 2d 888; *Cox v. State, supra,* cited with approval in *Hall v. State, supra.*

Lt. Kemple testified that Presley was picked up about 1:30 p.m. on January 5, 1960. Presley admitted that he was brought to the police station at 1:45 p.m. on that date and that the statement was begun at 10:50 p.m. Lt. Kemple further testified that after picking up Presley he was taken to the Central Police Station and interrogated, beginning at 1:38 p.m. on said date until approximately 4:10 p.m., at which time he was placed in the police line-up and thereafter given a polygraph test; that the line-up and polygraph test continued from 4:15 p.m. until 6:30 p.m.; that beginning at 6:50 p.m. and ending at 8:45 p.m. the defendant was further questioned, and toward the end of this period Presley made certain admissions which definitely involved him in the rape. However, these statements were not reduced to writing until further questioning, beginning at about 9:30 p.m. and ending at 10:50 p.m. on that date. The statement marked State's Exhibit No. 12 (Description of the Rape) shows the same to have been signed at 10:50 p.m. Lt. Kemple testified that Presley at no time was mistreated, fainted, nor became exhausted as claimed by the appellant. The appellant, however, asserted that the only reason he gave the statement marked Exhibit No. 12 was due to the fact that he had become exhausted after severe threats and beatings and that the interrogation was interrupted at 8:45 p.m. because he had fainted. There was thus presented a conflict in evidence which was first considered by the court and then by the jury. Presley was also interrogated on January 6, beginning at 12:45 p.m., and gave the statement marked State's Exhibit No. 13, when in a cruiser accompanied by various officers, in which he was taken to the scene of the crime and recounted the route he took on January 3 in company with the little girl. This statement was concluded at 2:55 p.m. and signed on the same day at 3:50 p.m. Later, on the same day, he gave the statement

shown as State's Exhibit No. 14, which dealt mainly with the automobile used in the crime. This interrogation began at 8:20 p.m. in the homicide squad room, was concluded at 9:05 p.m. and signed on January 6 at 9:15 p.m.

The number and length of his interrogations fall short of a "showing of coercion" as would render the statements involuntary.

His third contention regarding the statements surrounds his charges of police brutality. The only evidence introduced to show any mistreatment of the appellant was his own testimony. He took the stand for the limited purpose of contesting the voluntariness of the statements. He stated that he had "not been beat or threatened with death", or threatened in any way except immediately prior to the giving of the first statement. All of the witnesses to the statements were produced by the State and testified that no threats or force of any kind were used against the defendant prior to the taking of the statements. Each witness was cross-examined by the appellant's counsel, during which time references to specific instances of alleged threats or violence were denied. On this point also we have a conflict of testimony which it was the duty of the court in the first instance and then the jury to resolve. Furthermore, the trial court very carefully instructed the jury that it was its duty to determine from the evidence offered whether or not the three confessions offered were voluntary and should be believed. The judge in his advisory instruction stated:

"* * * you have heard a great deal of testimony regarding the alleged confession or confessions, possibly you have wondered why you have heard that and why I allowed the confessions to be admitted in evidence. You have heard that because as part of this case and as part of your deliberation, it is for you to determine regardless of what the court has done, whether or not those confessions were voluntary and whether they should be believed. That is your problem, with all the other matters to be considered in arriving at your verdict."

562

For a recent and full discussion of all of the points involved with reference to the confessions see the opinion by Chief Judge Brune in *Hall v. State, supra.*

Finding no reversible error in the trial below we must affirm.

*Judgment affirmed.*