## BEAN v. STATE

[No. 149, September Term, 1963.]

434

*Decided April 28, 1964.*

The cause was argued first before BRUNE, C. J., and HEN-DERSON, PRESCOTT, HORNEY and SYBERT, JJ., and reargued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*Robert B. Barbour* and *W. A. C. Hughes, Jr.,* (on both arguments) for appellant.

436

*Mathias J. DeVito, Assistant Attorney General,* (on both arguments), with whom were *Thomas B. Finan, Attorney General,* and *George W. Bowling, Special Assistant Counsel for State, Waldorf, Maryland,* on the brief, for appellee.

SYBERT, J., delivered the opinion of the Court.

The appellant, John M. Bean, was indicted by a Charles County Grand Jury on a charge of rape, to which he pleaded not guilty and not guilty by reason of insanity. He elected a non-jury trial, and a two-judge court found him guilty, and further found that he was sane at the time of the commission of the crime and at the time of trial. He was sentenced to the penitentiary for life and this appeal ensued.

The victim of the rape was a housewife whose home was on the outskirts of La Plata, the county seat of Charles County. On October 11, 1962, at approximately 12:45 P.M., on entering her basement from an outside stairway, she observed a person (whom she later identified as the appellant, a fifteen year old colored youth) standing in a large closet where food was stored. As she turned and ran up the steps to the outside, she could see that the intruder was following her with a baseball bat. At the top of the stairs she was struck on her head, dragged down the steps, struck again, and gagged with her apron, and her assailant then ravished her. She remained conscious. After the attack the assailant stated his intention to kill her, but she was able to dissuade him after pleading for some time and offering him money. After her assailant departed, the victim went to a neighbor's home, told of the attack, and asked that an ambulance be called to take her to a hospital. The neighbor called the police and an ambulance. The county sheriff arrived at the neighbor's home at about 1:00 P.M. and talked with the victim as she was being placed in the ambulance. As a result, the sheriff put out a lookout for a young colored male wearing a blue plaid shirt. A baseball bat, a torn apron and two sizeable spots of blood were found in the basement of the victim's home.

At 1:45 P.M. the sheriff and a deputy went to the appellant's home in or near La Plata. The appellant told the officers that he had been at home that day except for a short walk. The offi-

cers then returned to the home of the victim. Later that afternoon the sheriff instructed one of his deputies to pick up the appellant and bring him to the victim's home. The deputy found the appellant at a local store and asked him if he would go to the victim's home to talk with the sheriff. The appellant agreed and the two arrived at the home of the victim at about 3:30 P.M. The sheriff told the appellant that he was a suspect and asked whether they could go to his home to look around. The appellant said it would be "okay" and went with the sheriff and the deputy to his home. The appellant remained in the sheriff's car while the officers looked around. About twenty feet from the house they found some fragments of burnt clothing and a buckle in a wood stove. At this point, according to the testimony of both officers, the appellant got out of the car, proceeded to "get mad", and said: "Every time something happens you [so-and-sos] have to pick on me." The three then drove back to the victim's home. After a few minutes the sheriff directed one of his deputies to take the appellant to the courthouse, while the sheriff followed in another car. On the way they stopped at the hospital to see if the victim could identify the appellant, but she was under medication and asleep and could not be disturbed. The sheriff, his deputy and the appellant then went to the sheriff's office in the courthouse, arriving at approximately 5:00 P.M., and the appellant was placed in a small lockup room.

The sheriff then returned to the Bean home and talked with the appellant's sister and another girl there. He thereupon obtained two warrants for the arrest of the appellant, one charging rape and the other assault with intent to murder. At least one of the warrants was read to the appellant about 6:00 P.M. At 7:00 P.M. the appellant was taken to the county jail, located next door to the courthouse, and was placed in the juvenile detention room, which had a bunk and water facilities in it. From that time until 12:00 midnight, the appellant remained in the detention room while the deputies investigated the case. The investigation having been finished, at least for that day, the appellant was taken at or a little after midnight to the sheriff's office, where he was fingerprinted and then taken

into a room for questioning by a deputy. The deputy testified that he told the appellant "I'd like him to get it off his chest", and that he further told him that any statement "could be used either for or against him in a court of law." Shortly thereafter, the appellant gave an oral statement confessing the rape, and relating certain details in connection with the attack which the officers had not yet learned from the victim, because of her condition, but which coincided with her subsequent description of the occurrence. The details were matters of which only the appellant and the victim could have been aware. The deputy testified that when he asked the appellant to reduce the statement to writing, the latter said he'd rather the deputy write it, which was done. Thereupon another deputy was called into the room and the statement was read in its entirety. The appellant, asked whether it was correct, replied that it was, and then signed it, with both deputies signing as witnesses. The statement shows that the deputy who wrote it began at 1:05 A.M. and finished at 2:00 A.M., when the appellant was returned to jail.

The appellant was subsequently identified by the victim, once from a photograph while she was still in the hospital, and once after seeing him in the sheriff's office. In addition, the victim testified that she had seen the appellant on the road in her neighborhood several times prior to the attack. At the trial she identified him as the perpetrator of the rape when (as the trial court commented in reviewing the evidence before verdict) he was sitting with several other young men of about his age.

The appellant's seventeen year old sister testified that he had left their home before she awakened at about 11:30 A.M. to 12:00 noon on the morning of the crime, but that he had come home about a half hour before the sheriff arrived. She said he took white shoe polish (the evidence indicates that he was wearing white canvas shoes) and a glass to a spring near the house, and both she and the sheriff testified that his shoes were cleaned or freshly polished. The sister further testified that he had changed his clothes and started a fire in the outside stove.

One of the psychiatric reports in the case shows that the appellant was six feet and one inch in height, and weighed 140

pounds. In their closing arguments both counsel for the State and for the defense commented on the fact that the appellant appeared to be some years older than his actual age.

The appellant has raised several questions here, the first being that the lower court committed reversible error in admitting his confession in evidence. Two main reasons are asserted: first, the confession was not voluntarily made, and second, the confession was not admissible because it was obtained while the appellant was under illegal detention. We shall first consider the question of voluntariness and then the legality of the detention at the time the confession was made.

The rule as to the admissibility of confessions and review on appeal was recently restated by this Court in *Abbott v. State,* 231 Md. 462, 465, 190 A. 2d 797 (1963), as follows:

> "The rule regarding the admissibility of a confession is that the State must prove that it was freely and voluntarily given and that it was not the product of force or of a promise, threat or inducement whereby the accused might be led to believe that there would be a partial or total abandonment of prosecution. * * * Whether the confession was freely and voluntarily made necessarily depends on the facts and circumstances in each case. And whether the confession should be admitted as evidence is ordinarily a matter for the trial court to decide and its determination will not be disturbed on appeal unless there was a clear abuse of discretion." (Citations omitted.)

See also *Ralph v. State,* 226 Md. 480, 174 A. 2d 163 (1961), cert. den. 369 U. S. 813 (1962) ; *Presley v. State,* 224 Md. 550, 168 A. 2d 510 (1961), cert. den. 368 U. S. 957 (1962) ; *Hall v. State,* 223 Md. 158, 162 A. 2d 751 (1960) ; *Merchant v. State,* 217 Md. 61, 141 A. 2d 487 (1958) ; and *Grammer v. State,* 203 Md. 200, 100 A. 2d 257 (1953), cert. den. 347 U. S. 938 (1954).

Viewing all of the facts and circumstances of this case, we do not believe that the lower court abused its discretion in finding that the confession was voluntary and therefore admissible. The appellant has set forth several factors which he con-

tends made his confession inadmissible: lack of sleep, food, and drink; lack of an opportunity to consult with an attorney or members of his family before confessing; his intellectual deficiency; and the fact that he was only 15 years old when the confession was made. We do not find these contentions convincing. The appellant claims that he was not given food or drink from the afternoon when he was arrested until sometime the following day. However, during the two hours while he was in the lockup in the sheriff's office, the appellant could have had water for the asking, and during the five hours he was in jail he had water facilities in the detention room. As to food, there was evidence from which the court could find that the jailer had fed the appellant on the night in question. But even if this evidence were not accepted, the appellant admits that he never asked for either food or water. He further claims that he did not have any sleep before the confession was obtained. However, the evidence shows that he was given an opportunity to sleep for at least five hours before he was questioned, and one of the deputies testified that he found the appellant lying down on the bunk in the detention room when he took him to the sheriff's office for fingerprinting and questioning.

The appellant did not have benefit of counsel before he made his confession, but this fact would not necessarily render the confession inadmissible. Nor did the appellant talk to members of his family. The sheriff had made a search for the appellant's father in the afternoon, as the result of which the father came to the sheriff's office at about 6:00 P.M., but neither he nor the appellant asked to talk with each other. The father made no effort to obtain counsel to confer with the appellant, nor did either request that counsel be supplied. It has often been held that failure to consult with counsel or family, especially where not requested, will not in itself render a voluntarily made confession inadmissible. *Miller v. State,* 231 Md. 158, 189 A. 2d 118 (1963) ; *Jones v. State,* 229 Md. 165, 182 A. 2d 784 (1962) ; and *Hyde v. State,* 228 Md. 209, 179 A. 2d 421 (1962). See also *Crooker v. California,* 357 U. S. 433, 2 L.Ed. 2d 1448 (1958).

The appellant also contends that his age and mental ability

rendered the confession involuntary, since he was only 15 years old and, according to a psychologist, had a full scale I.Q. of 74 at the time of the confession. While these factors were properly considered by the trial judges, they were not sufficient to make the confession inadmissible. The appellant had sufficient reasoning ability to give the sheriff an alibi when he was first accosted, and was self-assertive enough to curse the sheriff when the fragments of burned clothing were found later. The record shows that his testimony was alert and lucid when he took the stand for the limited purpose of discussing the confession. A psychiatrist who examined him when he was sent to Clifton T. Perkins State Hospital for examination found the appellant to be sane, and further stated that he was "attentive, cooperative, surprisingly polite and quite serious about the proceedings." When it was called to his attention that the appellant's I.Q. had been listed as 61 when he was an inmate of Boys' Village some time prior to the crime involved here, the psychiatrist testified, "I would say that behaviorally, and daily communication, and so on, one would expect that his I.Q. should be in the vicinity of eighty." We think the evidence supported the trial court's finding that the appellant's mental condition was such that he realized the significance of what he was doing when he confessed. Cf. *James v. State*, 193 Md. 31, 65 A. 2d 888 (1949), wherein the confession of a defendant with an I.Q. of 60 to 65 was held admissible. While the appellant was only 15, this alone would not make his confession inadmissible. This Court has upheld the admission of confessions from infants in several cases under a variety of circumstances. *Linkins v. State*, 202 Md. 212, 96 A. 2d 246 (1953), (confession of 18 year old) ; *Jones v. State*, 188 Md. 263, 52 A. 2d 484 (1947), (confession of 18 year old) ; and *Birkenfeld v. State*, 104 Md. 253, 65 Atl. 1 (1906), (confession of 16 year old).

It was admitted by the appellant on the stand that no physical force was used and no threats or promises were made either by the sheriff or his deputies in order to obtain the confession. The appellant testified that the deputy who questioned him "told me to 'come on, confess' to get it off my chest". The deputy stated that he told the appellant "I'd like him to get it off his chest". Regardless of which version is accepted, neither

statement could be considered an improper inducement or threat, especially since the deputy also told the appellant that whatever he said could be used for or against him. In *Ralph v. State, supra,* we held that when a police officer stated "it would be better if he [the defendant] told the truth", there was no improper inducement to confess. See also *Merchant v. State, supra.* The statement in the present case does not fall within the category of those condemned in *Kier v. State,* 213 Md. 556, 132 A. 2d 494 (1957), and *Edwards v. State,* 194 Md. 387, 71 A. 2d 487 (1950).

The appellant has placed great emphasis on the case of *Haley v. Ohio,* 332 U. S. 596, 92 L.Ed. 224 (1948), wherein the Supreme Court held that it was reversible error to receive in evidence a confession of a 15 year old boy, who had been questioned for five straight hours "through the dead of night by relays of police". However, in *Haley,* it was the youth of the defendant, in combination with the protracted and coercive nature of the questioning, or, as stated in *Culombe v. Connecticut,* 367 U. S. 568, 624, 6 L.Ed. 2d 1037 (1961), "the totality of circumstances", that invalidated the confession. In the present case there was no protracted and unrelenting questioning by relays of police. The appellant confessed after being questioned for something less than one hour by a single officer. Longer periods of questioning by more than one officer have often been held not to invalidate a confession. *Jones v. State,* 229 Md. 165 (*supra*) ; *Ralph v. State, supra;* and *Presley v. State, supra.* While the questioning occurred late at night, this was necessitated by the fact that it was only then that the officers had completed their preliminary investigation, and the appellant had just had five hours' rest. Cf. *Jones v. State,* 188 Md. 263 (*supra*), wherein this Court upheld the admission of a confession as voluntary even though the defendant, who was 18 years old, had been arrested at midnight, driven from Salisbury to Harford County (a distance of some 100 miles), and questioned from 5:00 A.M. until 5:30 A.M., when the confession was made.

Considering the allegations of the appellant in light of all the circumstances in the present case, we believe that the State

has met the burden of showing that the appellant's confession was not the product of force, either physical or psychological, or of threats, promises or inducements. We cannot say that the lower court abused its discretion in finding that the confession was freely and voluntarily made, and therefore must hold that the confession was not erroneously admitted in evidence, as against the claim that it was coerced.

As a second ground for excluding the confession, the appellant claims that it should not have been admitted because it was obtained while he was under an illegal detention. This claim is based upon the allegation that when the appellant was arrested and placed in jail, only one warrant was issued, that charging assault with intent to murder, and since this was a crime not punishable by death or life imprisonment, it was not a case for the criminal court, but one for the juvenile authorities under Code (1957), Art. 26, Secs. 51, *et seq.* Therefore he claims that any proceeding without a waiver of jurisdiction by the juvenile court pursuant to Sec. 54 of Art. 26 and Maryland Rule 911, including an examination by the police, was improper. However, the record clearly shows that two warrants were issued on the day of the crime, one charging rape and the other assault with intent to murder. The sheriff, several deputies, and the magistrate who issued the warrants, testified that they remembered only one warrant, but even so, the warrant which they recalled having been issued and read to the appellant was the one which charged rape, not the assault warrant. The crime of rape being punishable by death or life imprisonment, Art. 27, Sec. 461, the juvenile court did not have jurisdiction thereof, under the terms of Art. 26, Sec. 52(e), and thus it was unnecessary for it to waive jurisdiction before there could be a proceeding in the criminal court. *Savoy v. Warden,* 216 Md. 616, 139 A. 2d 257 (1958). But even if only the warrant charging assault with intent to murder had been issued, the detention of the appellant was not illegal. A proceeding before the juvenile court is not instituted at the time of arrest but thereafter by the filing of a petition by the State's Attorney or some other person having knowledge of the facts, pursuant to Rules 902 and 903. Prior to the filing of such a petition, the State has the right to conduct a normal investigation,

including an interrogation of the defendant, in order to determine whether a petition under Rules 902 and 903 would be appropriate, or whether, as here, the case was one for the Grand Jury. In any event, this Court recently held in *Prescoe v. State,* 231 Md. 486, 191 A. 2d 226 (1963), that an illegal detention will not invalidate a confession that is in fact voluntary. *McNabb v. United States,* 318 U. S. 332, 87 L.Ed. 819 (1943), and *Mallory v. United States,* 354 U. S. 449, 1 L.Ed. 2d 1479 (1957) are cited by the appellant for the proposition that an illegal detention will invalidate a confession, but the *McNabb* and *Mallory* cases have been held not applicable to State prosecutions. *Culombe v. Connecticut, supra; Stein v. New York,* 346 U. S. 156, 97 L.Ed. 1522 (1953); *James v. State, supra.* Therefore the appellant's claim that he was being held under an illegal detention which invalidated his confession is without merit.

The next contention raised by the appellant is that the trial court committed prejudicial error in permitting the victim of the rape to testify as to her extrajudicial identification of the appellant. While still in the hospital, the victim was shown four or five photographs of young colored men (up to 20 years of age) and picked out the appellant as her assailant. On another occasion, she identified the appellant as her assailant in the sheriff's office while he was standing by himself. The short answer to the appellant's claim is that all testimony relating to these identifications was elicited by counsel for the appellant, not the State. Having brought up the subject, the appellant is hardly in a position to claim that the testimony relating thereto was not admissible. In any event, an extrajudicial identification is admissible in evidence if made under circumstances which establish its fairness, integrity and reliability. *Proctor v. State,* 223 Md. 394, 164 A. 2d 708 (1960). There was no evidence introduced to show that the identifications made by the victim in the present case were not fair and reliable. The victim had seen her assailant several times before the day of the crime; she had previously refused to identify another suspect as her assailant; and the circumstances under which she identified the appellant were entirely proper. But even if the testimony now complained of had been improperly admitted, there would be no prejudicial

error since it only amounted to cumulative evidence, the victim having positively identified the appellant at the trial. *Tate v. State,* 229 Md. 454, 184 A. 2d 739 (1962).

The appellant also maintains that the lower court was in error in considering the evidence with respect to the baseball bat which the assailant used to strike the victim, the burnt clothing and buckle which were found in the stove at his home, and the testimony that the appellant polished his shoes upon coming home on the day of the crime. The seized articles were submitted to the FBI for analysis, but the findings were negative. However, the evidence about which the appellant now complains was admitted without objection, and therefore its admissibility is not before this Court. Rule 885. Thus, it was for the trial court, as the trier of fact, to determine what weight should be given to such evidence. *Gault v. State,* 231 Md. 78, 82, 188 A. 2d 539 (1963).

Finally, the appellant contends that the trial court lacked jurisdiction and venue to try the case because "at no point in the evidence was it established that the alleged crime took place in the State of Maryland or in any specified county thereof." However, the testimony plainly showed that the victim's home, where the offense occurred, was on the outskirts of the town of La Plata, which is the county seat of Charles County, in this State, where the trial was held. Geographical facts of a local nature may be judicially noticed by a trial court to establish venue, and this is particularly true as to the location of towns within a particular county where the court sits. See *Iozzi v. State,* 224 Md. 42, 166 A. 2d 257 (1960) (approving judicial notice that the town of Arbutus is within Baltimore County), and *Dean v. State,* 205 Md. 274, 107 A. 2d 88 (1954) (approving judicial notice that certain streets are located in Baltimore City). Obviously if the trial court could take notice that La Plata is in Charles County, it could take notice that the County is within this State. Moreover, with respect to the question of venue, as distinguished from jurisdiction, any objection as to improper venue was waived by pleading to the charge. *Cole v. State,* 232 Md. 111, 194 A. 2d 278 (1963), and cases cited. See Rule 725 b.

Finding no error below, we shall affirm.

*Judgment affirmed.*

446

PRESCOTT, J., filed the following dissenting opinion, in which BRUNE, C. J., and HORNEY, J., concurred.

There can be little doubt that an inexpiable and very brutal crime, as it was described by her, was committed at the home of the prosecuting witness on October 11, 1962. Also there is little doubt that the State offered sufficient evidence, extrinsic of appellant's confession, to have warranted his conviction of the offense of rape, which formerly, in many jurisdictions, would have justified an affirmance of the conviction. However, the Supreme Court of the United States, in comparatively recent years, has laid down certain rules with reference to constitutional questions that are binding upon all of the State courts. Hence, we must examine the evidence in the light of those rules and see if it can stand the test of disclosing that appellant was not denied due process of law, for under our constitutional system of government, the guilty, as well as the innocent, must be afforded constitutional due process. *Culombe v. Connecticut,* 367 U. S. 568. And in determining whether there has been a denial of due process by reason of admitting a coerced confession, the Supreme Court will not consider the sufficiency of the evidence extrinsic of the confession to sustain the conviction. *Haynes v. Washington,* 373 U. S. 503; *Haley v. Ohio,* 332 U. S. 596. Cf. *Fahy v. Connecticut,* 375 U. S. 85.

I concur in all of the rulings of the majority, except the holding that the State proved the appellant's confession was "freely and voluntarily" given. I accept the quotation from *Abbott v. State,* 231 Md. 462, used by the majority, as being the unquestioned law of this State, and also recognize that no physical violence, threats thereof, or promises were used to extract a confession from the accused. However, a confession may be "coerced," and therefore inadmissible as evidence, without these factors being present. *Culombe v. Connecticut, supra.* In *Culombe,* the Supreme Court stated that the police may make a suspect an unwilling collaborator in establishing his guilt "not only with ropes and a rubber hose * * *, by relay questioning persistently, insistently subjugating a tired mind [but also] by subtler devices. * * *. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is,

if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. [citation] The line of distinction is that at which governing self-direction is lost and compulsion, *of whatever nature or however infused,* propels, or helps to propel, the confession." (Emphasis added.) The Supreme Court, in *Haynes v. Washington, supra,* held that the confession therein involved "was obtained in an atmosphere of substantial coercion and inducement," and expressed the same principle quoted above from *Culombe,* in terms slightly less esoteric: "In short, the true test of admissibility is that the confession is made freely, voluntarily and without compulsion or inducement *of any sort.* * * *. Haynes' undisputed testimony as to the making and signing the confession used against him at the trial leave no doubt that it was obtained under a *totality of circumstances* evidencing an involuntary written admission of guilt [italics added]." This Court has likewise recognized that a confession may be psychologically coerced as well as being coerced by physical brutality. *James v. State,* 193 Md. 31. Cf. *U. S. v. Mitchell,* 322 U. S. 65; *Palko v. Conn.,* 302 U. S. 319; *Chambers v. Florida,* 309 U. S. 227; *Upshaw v. U. S.,* 335 U. S. 410. And see *Fahy v. Connecticut, supra,* wherein the Supreme Court stated that an accused "should have a chance to show that his admissions were induced by being confronted with illegally seized evidence."

Before attempting to apply the above tests to our present case, it will be necessary to add slightly to the statement of facts of the majority, because one cannot get from them the full picture as it is disclosed in the record extract. Appellant is a Negro adolescent, fifteen years of age, "emotionally unstable," with an I.Q. of about 61, one of "borderline intelligence." Another test showed the I.Q. to be about 74. Upon being notified of the crime, the sheriff, immediately and properly called in "all of the deputy sheriffs he could locate." He and Deputy Sheriff Canter located appellant at his home, at about 1:45 p.m. on the day of the offense, and, after questioning him left him there. Shortly thereafter, the sheriff radioed Deputy Sheriff Jameson to bring appellant to the house of the

prosecuting witness. After locating him, Jameson and appellant arrived at the Dobry home at about 3:30 p.m. The sheriff told him he was a suspect and the sheriff and this deputy questioned him, and asked if they might go to his home and look around, to which he assented. They drove to his home, where he was "asked" to stay in the car. The sheriff and his deputy searched the premises, and obtained evidence that was presented at his trial. The three drove back to the Dobry house, and after a few minutes, the sheriff instructed another deputy, one Fuller, to take appellant to the court house, while the sheriff followed. On the way, they stopped at the hospital (where appellant was "shaken down" according to the sheriff) to see if Mrs. Dobry could identify appellant, but she was "under medication." They proceeded to the sheriff's office, arriving at about 5:00 p.m. Appellant was placed in the "lockup" room. This room was approximately 4 by 6 feet and located within the entrance room to the sheriff's offices. It had no windows, was ventilated, and was furnished only with a bench. In about five minutes, the sheriff left. Magistrate Scott apparently was in charge of the office in the absence of the sheriff. A warrant, charging appellant with having committed the offense at the Dobry home, was read to him by Fuller at about 6:00 p.m. At around 7:00 p.m., appellant was taken from the "lockup" room in the sheriff's office by two other deputy sheriffs, Monroe and Mudd, and placed by himself, in the juvenile detention room of the jail. At 12:00 p.m., midnight, he was removed by Monroe and Mudd from the jail back to the sheriff's office, where he was placed in the custody of another deputy sheriff, one Cooksey. He, of course, passed the "lockup" room where he had been from 5:00 to 7:00 p.m. Cooksey took his finger prints, and then took him into the sheriff's private office where they were alone. Cooksey questioned appellant, and told him that he, Cooksey, would "like him to get it off his chest." At 1:05 a.m., Cooksey began to write appellant's confession and it was completed at about 2:00 a.m.

Thus, it is seen that it is doubtful whether the statement in the majority opinion "appellant confessed after being questioned for something less than an hour by a single officer" is completely accurate. Between 3:30 p.m. on October 11 and 2:00

a.m. the following morning, appellant was in the custody of, and came in contact with, no less than eight law enforcement officials. He was questioned by most of them, and saw some of them more than once as he was moved back and forth in the officers' cars. After 3:30 p.m., the record does not reveal that he saw friend, relative or a lawyer. It was shown that the father came to the sheriff's office around 6:00 p.m. (because the sheriff was searching for him), and it is asserted that appellant failed to request that he be allowed to talk with his father. However, there is not the slightest evidence to show that appellant knew his father was there. It is also asserted that "there was evidence from which the court could find that the jailer had fed the appellant on the night in question." The evidence as to whether appellant received food was conflicting, but if the accuracy of the last assertion be conceded, the fact remains that the trial court made no finding on the point. The only significance I place upon appellant's having received food, or not, is whether he was just "tired of fighting" (as we shall soon see he claimed) and the possible psychological effect of fearing that he was not going to receive food if he failed "to cooperate." The officer who obtained appellant's confession stated that the reason the boy was left incarcerated for seven hours and then taken out of jail at midnight and removed to the sheriff's office was because "we were busy at the scene, trying to gather any evidence we could find there." The officers had been at the scene of the crime in relays since 1:00 p.m. in the afternoon. Mrs. Dobry had left for the hospital at about that time. It hardly seems possible that they could not have made a thorough search of the scene between 1:00 p.m. and dark—surely before midnight. In any event, it was not shown that any new evidence was obtained by the officers after 7:00 p.m. and before midnight.

Appellant testified he had eaten breakfast in the morning, but had had no food since that time and when he confessed. He also had had no water or other liquid to drink after being arrested, and had not been to sleep after being placed in jail. Cooksey told him to "come on, confess, to get it off my chest," he "got tired of fighting it, so I went on and confessed."

Applying the principles of law laid down by the Supreme

Court, as we have set them forth above, to the undisputed facts surrounding the taking of appellant's confession, I am impelled to the conclusion that the State failed in its burden to establish that the confession was "freely and voluntarily" made. We have here an ignorant adolescent Negro of fifteen who was moved back and forth in police cars beginning at 1:45 p.m. in the afternoon until 5:00 p.m., during which he was questioned by a number of officers, and then placed in a 4 by 6 foot "lock-up" without windows, where a warrant, charging him with a most serious offense was read to him. He was kept therein until 7:00 p.m., and then removed to the county jail. He was removed from the county jail at midnight for fingerprinting and questioning. The police did not tell him that his father was at the jail in the evening, or ask him if he desired to see his father. He had seen no friend, relative or lawyer. The Courts, in my opinion, should not be so naive as not to realize the purpose and motive of taking a fifteen year old youth out of jail at midnight for the purpose of fingerprinting and questioning. (Under compelling circumstances not here present, this might be permissible.) It is clear to me that it was done, because experience had taught the mature police that a tired, scared boy is more susceptible to their questioning at midnight than one who is not tired or frightened in daylight hours. There was no sufficient reason shown why he could not have been questioned at any reasonable hour before midnight or on the following morning.

Can it realistically be said that a confession obtained under the above circumstances (a) was not "obtained in an atmosphere of substantial coercion and inducement"; (b) was obtained under a situation where "the totality of circumstances" did not evidence a confession that was not freely and voluntarily (as these are defined by the law) made; or was obtained at a time when the appellant still maintained his "governing self-direction" and there was no "compulsion, of whatever nature or however infused, [that] propel[led] or help[ed] to propel the confession"? I believe not; the same tactics have induced many mature, well-educated men to confess.

The facts in the case of *Haley v. Ohio*, 332 U. S. 596, were quite similar, but somewhat more drastic, to those in the case

at bar. There, a Negro boy of fifteen was arrested at midnight, and questioned by five or six policemen in relays of one or two each. (In the case at bar, appellant was in the custody of seven police officers, in relays of one to three, from early afternoon until after midnight. He was questioned both before and after midnight, but was not questioned while he was in the "lockup" room or the jail.) After about five hours he confessed. The Supreme Court stated: "Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces." It then set aside his conviction on the ground that the confession, after the several hours of questioning during the night by the police without any friend or legal counsel at hand, had been obtained by methods at variance with fundamental concepts of fairness and justice.

I would reverse, and remand for a new trial.

Chief Judge Brune and Judge Horney have authorized me to say they concur in this dissent.